## FORREST *v.* WARDMAN.

EXCHANGE OF LANDS; EQUITY; FRAUD; DAMAGES; RESCISSION.

1. One who secretly purchased the services of another person's confidential agent in effecting an exchange of properties is legally and

equitably responsible for, and is liable to make good to such other person, whatever loss the latter has legally or equitably sustained.

2. Where one party to an exchange of properties, at agreed values, has so conducted himself as to give the other a right to have the contract set aside, and at the same time has put it out of his own power to place the aggrieved party *in statu quo*, he may be compelled to respond in damages.

3. Where equity has taken jurisdiction of a suit for the rescission of a contract, and one of the parties has put it out of his power to place the other, the aggrieved party, *in statu quo*, damages will be ascertained and awarded in equity to avoid a multiplicity of suits.

4. The measure of damages recoverable by the plaintiff in a suit for the rescission of a contract for the exchange of lands, based upon the fraud of the defendant, where the defendant has sold the land he acquired in the exchange, but has reacquired by mortgage foreclosure the land given up by him in the exchange, is the actual, and not the agreed, exchange value of the land which the plaintiff parted with, and any cash consideration paid by the plaintiff, with interest on the whole, less the net income, if any, received by the plaintiff from the land originally belonging to the defendant, while it was in the plaintiff's possession.

No. 2488.  Submitted April 28, 1913.  Decided June 2, 1913.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, dismissing a bill filed to set aside certain alleged fraudulent conveyances.

*Reversed.*

The facts are stated in the opinion.

*Mr. W. Gwynn Gardiner, Mr. Roger J. Whiteford,* and *Mr. Blaine Coppinger* for the appellants.

*Mr. Edwin C. Brandenburg, Mr. Clarence A. Brandenburg,* and *Mr. F. Walter Brandenburg* for the appellees.

Mr. Justice STAFFORD, of the Supreme Court of the District of Columbia, who sat with the court, in the place of Mr. Justice VAN ORSDEL, delivered the opinion of the Court:

This is a bill to set aside certain conveyances on the ground of fraud, to reinstate the complainants, Bladen Forrest and Henrietta Forrest, in their original rights, or, if that cannot be done, to recover the value of such rights. We shall relate the facts as they are disclosed by the evidence, and then consider what equity requires.

Bladen Forrest, a man of some sixty years of age, who was formerly for many years a ticket agent on the elevated railroad in New York, had come to Washington a few years ago and invested what property he had in real estate in this city, and in most instances in equities of redemption. For the most part he had made these investments through the real estate corporation, Moore & Hill, who had also acted as his agents in the care of the two largest pieces of the property and the collection of rents therefrom. The representative of this corporation, with whom most of his business had been transacted, was the defendant Rignald W. Beall, vice president of the corporation. At the time when the story of this case begins, Forrest's property was in five pieces of real estate:

(1) The Vernon apartment house on U street, which he had obtained through Moore & Hill by exchanging other property therefor at the valuation of $30,000, but upon this property there was a trust which, at the time now in question, amounted to $16,500, leaving, on the basis of said valuation, an equity in Forrest of $13,500.

(2) The Harvard apartment house on Harvard street, obtained through Moore & Hill by the exchange of other property at the valuation of $30,000. Upon this property there was a trust which, at the time now in question, amounted to $11,000, thus leaving in Forrest an equity of $19,000.

(3) The property known as 903 S street, obtained through Moore & Hill by exchange at a valuation of $6,000. Upon this

property there was a trust which, at the time in question, amounted to $2,500, leaving in Forrest an equity of $3,500.

(4) The property known as 2116 G street, which had not been obtained through Moore & Hill, but through another office at $3,625 cash.

(5) A vacant lot, being No. 12 in square 1096, which Forrest had bought at public auction for $709.56.

This was the situation of his affairs in September, 1909. One day at about that time he went to Moore & Hill's office to see about some property of his which was in their care and, after finishing that business, as he was going out, he saw Beall at his desk and asked him to make a deal by which he could trade his properties for others that would produce a larger income. Beall said he thought he could do it, and made an engagement to come to Forrest's house and show him some property. Two days later he came in an automobile to Forrest's house and took Forrest to see the Wellington and the Birmingham, two apartment houses, telling him that the Wellington was built by Harry Wardman, whose price therefor was $180,-000. The house was not quite finished at that time, but was substantially completed and nearly all of the apartments were occupied. Beall told Forrest that Wardman would take the five properties above referred to if Forrest would assume the first mortgage on the Wellington, amounting to $100,000, and give a second mortgage thereon for forty or fifty thousand dollars. They also had some talk about the Birmingham, which was another of Wardman's houses. When this talk occurred, Forrest had not given Beall a list of his properties, but a little later, on the same day or the day after, Beall was to come to Forrest's house and get such a list. He had already told Forrest that the rents of the Wellington were $1,508 a month, that the Wellington was worth $180,000, and that Wardman could get that for it. The same or the next night Beall came again to Forrest's house and took a list of Forrest's properties, with the amount of mortgage thereon. The values he fixed himself and wrote them down. The list aforesaid was set down on the fourth page of a circular purporting to be issued by the ex-

change department of Moore & Hill, on page 1 of which appeared a cut of the Wellington and on page 2 a statement of the income of the house. The writing on said fourth page in Beall's own hand is as follows:

"Interest on $100,000 at 6% ................... 6,000
Expenses of carrying a Taxes ................... 2,750
Interest on 2d trust, $40,000 ................... 2,400
$300 month on principal ........................ 3,600
　　　　　　　　　　　　　　　　　　　　　　$14,750
Harvard at 30,000 trust 11,000 ................ 19,000
Vernon " 30,000 " 16,500 ................ 13,500
902 S 6,000 " 2,500 ................ 3,500
(2116 G 5)* 3,000 ................ 2,000
Lot 12 sq. 1096 ............................. 1,000"

Beall made a copy of what he had written on said fourth page, and took it away with him, and probably submitted it to Wardman, leaving the original with Forrest, who has had it ever since.

On September 13th a writing was presented to Forrest by Beall, and signed by Forrest, bearing that date, an unsigned copy of which is in the case as plaintiff's exhibit 4. It declares that in consideration of $1 paid by Wardman to Forrest, Forrest agrees to convey to Wardman or anyone he may designate the Harvard apartment, subject to a trust of $11,000, the Vernon apartment, subject to a trust of $16,500, No. 2116 G st., N. W., subject to a trust of $3,000, No. 903 S st., N. W., subject to a trust of $2,500, and lot 12 in square 1,096, and to give a second deed of trust for $35,000 upon the Wellington, subject to the existing trust of 100,000, and to pay $1,000 in cash without any charge by Moore & Hill or anyone for commission or other compensation in said exchange, Wardman to have the option of accepting the contract aforesaid within ten days from its date, the contract itself to be closed within thirty

---

*Words and figures inclosed in parentheses erased in copy.

days from acceptance.  Forrest and Beall went over the pros
and cons of the proposition, and Beall strongly advised For-
rest to make the exchange.  The relation between them was one
of confidence, Forrest believing that Beall was acting in his
interest and relying upon his representations, seeking no out-
side information touching the facts or the value of the prop-
erty.  Beall went away with the option and afterward told
Forrest that Wardman did not wish to take the 2116 G street
item.  The values at which the Vernon and Harvard apart-
ments were offered in the option were the same at which those
properties had been valued when Forrest had taken them
through Moore & Hill, and were represented by Beall as fair
valuations in this exchange, and Beall told Forrest that Ward-
man was satisfied with the valuations of the properties except
2116 G street, which he did not care for.  On the 2d of October
Beall came again to Forrest's house with a new contract of
that date, plaintiff's exhibit 2.  This contract is signed by For-
rest, but was never signed by Wardman, although Wardman
admits that he saw and accepted it.  It states that for $1 paid
by Wardman to Forrest, Forrest agrees to convey to Wardman
or to anyone designated by him the Harvard apartments, sub-
ject to a trust of $11,000, the Vernon apartments, subject to
trusts of $16,500, 903 S street, subject to a trust of $2,500, and
lot 12 in square 1,096, and to give a second trust on the Wel-
lington for $39,000, subject to the existing trust on the Wel-
lington of $100,000, and to pay $1,000 in cash with no charge
by Moore & Hill or by anyone for commission or other com-
pensation, contract to be closed within thirty days from date.
On this visit to Forrest's house, Beall came at about 10 o'clock
in the forenoon and stayed some two hours, saying that Ward-
man would not accept the first contract, and again going over
the whole proposition with Forrest.  Forrest objected that
Wardman had virtually raised the price, and that it appeared
to him that the price of the Wellington was high.  Beall re-
plied that Wardman could get $180,000 for it; that he held it
at that and sometimes at $200,000; that Forrest was getting
a good price for his equities, to wit, $37,000, and was getting

the Wellington for $177,000; that Wardman agreed that
Moore & Hill should have the $1,000 cash as their compensa-
tion; that the owners of the first trust on the Wellington,.
Swartzel, Rheem & Hensey, would be glad to renew that trust
when it was due, and that in Beall's opinion the deal was a
good one for Forrest. As a matter of fact, Beall, or Moore &
Hill, knew Wardman was willing to take $149,000, but told
Forrest that he demanded $177,000. Beall was specifically
asked by Forrest what Moore & Hill were to get out of the
deal, and replied that they were to get nothing except the $1,-
000 cash payment which Wardman had consented that they
might have, and when Forrest remarked that it was a very small
commission, Beall said he didn't care anything about the
commission as long as Forrest came out of the deal all right..
After signing this contract of October 2d in reliance upon
Beall's advice and representations, Forrest kept one of the con-
tracts, the same having been signed in duplicate, and Beall
took away the other, Forrest expecting that it would be signed
by Wardman. The contract of October 2d was accepted by
Wardman, but was never signed by him, and Forrest and his
wife conveyed the four properties by deed dated October 25,
1909, to Wardman & Bones, and having received from Ward-
man & Bones a deed of the Wellington, subject to the first trust,
executed to Wardman & Bones a second trust on the same date
on the Wellington for $39,000, subject to the prior trust of
$100,000. He also paid to Moore & Hill the $1,000 in cash
required by the contract of October 2d.

We shall now turn to Wardman's connection with the trans-
action. He occupied an office just above that of Moore & Hill,
and communication between the offices was easy and frequent, a
stairway at the back of the hall at the rear of Moore & Hill's
office communicating with the rear of Wardman's office, so that
the occupants of the two offices were able to and did speak with
each other without actually going from one office to the other.
Moore & Hill had acted for Wardman in a great many instanc-
es as sellers of his property, and were accustomed to get out
printed matter like the circular already referred to, describing.

and advertising Wardman's properties for sale. Wardman was a builder of large numbers of houses and apartments, and made use of other brokers as well as of Moore & Hill, but it is certain that Moore & Hill acted for him in making a great number of his sales. Wardman had been associated with members of the Moore & Hill corporation in numerous business transactions and speculations. He had asked them to sell or dispose of the Wellington for him. In negotiating with Beall for the exchange in question, Wardman had told Beall that he did not want the Forrest properties on his hands, and that if Moore & Hill would guarantee him $10,000 from them he would make the deal and Moore & Hill might have the properties, and when the contract of October 2d was entered into this was the understanding and arrangement between Wardman and Moore & Hill; namely, that Wardman should have $10 000 for the properties, subject to a payment to Moore & Hill for their services in the matter, to be referred to hereafter, and that Moore & Hill should have the properties to dispose of for their own benefit.

Wardman was called as a witness by the complainant, and testified with respect to his talk with Beall pending the negotiation as follows:

"The proposition came to me that 'we can make you this deal for this property, and we think we can handle this property, giving you about $10,000 in cash or you can take the property and handle it youself; make the trade straight to you.' I said, 'Well, I don't know just what I would do then. Mr. Beall, but you get it signed up and I will let you know which one I will take.' At that time I was also needing money and I took the money. . . . I think I got in the neighborhood of—I think about $8,000 after taking out expenses."

When asked what commission he paid Moore & Hill, he said at first, "I don't think I paid them any commission," but, when pressed, added, "Oh, I don't know—probably that was—there is a possible chance that I did pay some commission out of that $2,000. I got $8,000 out of the ten. Now I don't just remember whether I paid any commission or not, but probably

I did, and that was the reason that the expense run up on me.
I forget now just what."

Again and again he was asked as to whether he paid a com-
mission and finally said: "Well, I think I did," but protested
that he could not remember how much. Then he was asked
if he did not get from them a statement. He admitted that he
did, and that he had it, and that his books would show it.
Asked to produce his books and the original statement from
Moore & Hill to him, his counsel objected on the ground that
the same was not material, and the books were never produced,
but later the statement was produced and is printed in the
record. It is headed, "Mr. Harry Wardman and Thomas P.
Bones, case No. 714, in account with Moore & Hill, real es-
tate, loans, and insurance." The statement is dated November
2, 1909, in the sale of the Wellington, settled to October 25,
1909. It credits Wardman & Bones by price of property,
$149,000, which is evidently made up of the $100,000 first
trust, the $39,000 second trust, and the $10,000 which Moore
& Hill had agreed that Wardman should realize from Forrest's
properties. There is also a credit of $396.67 for insurance.
Then Wardman & Bones are charged with the first deed of
trust, $100,000, and the accrued interest thereon, with the sec-
ond deed of trust, $39,000, with certain rents to October 31st,
with taxes and with a small amount paid the janitor, with
$8,000 paid to him in cash, leaving an unpaid balance of
$1,209.66.

Upon this state of the facts we cannot fail to find that Ward-
man not only allowed Moore & Hill to take Forrest's prop-
erties off his hands at $10,000, but also allowed them to keep
the aforesaid balance as further compensation for their services
to him in putting through this deal. Nor can there be any
doubt that Wardman perfectly understood that Moore & Hill
were coming to him from Forrest and acting as Forrest's
agent. What he did was to buy the services of the other party's
agent upon the terms above stated. That is to say, the services
of the trusted and confidential agent of the other party to the
exchange. The same day that he received the deeds from

Forrest and wife, Wardham conveyed those properties to one Murdock, a clerk in Moore & Hill's office, having no real interest in the transaction, as a mere title holder for Moore & Hill. The subsequent transfers of the property by Moore & Hill's title holder need not be followed. The answers are not evidence, inasmuch as the oath thereto was waived by the complainant and the evidence does not clearly show what has been done with Forrest's properties, or what has been realized from them.

Soon after the deal was closed by the transfer of the properties, to wit, on October 27, 1909, Beall came to Forrest and procured from him an appointment of Moore & Hill as his exclusive agents to sell the Wellington on a 3 per cent commission, with an option upon the same for thirty days at the price of $200,000, subject to trusts of $139,000. Forrest went into possession of the Wellington and remained there for some twenty months. He became satisfied that he had been misinformed with respect to the value of the Wellington, but he never knew or suspected that his properties had been transferred to Moore & Hill until just before he brought this suit, nor did he know or suspect that the agent whom he had trusted had been acting in the employ of the other party to the contract. Indeed, full knowledge of the facts was not acquired until the testimony brought them to light, for even the answers did not disclose the real truth. Hence the complainant cannot justly be charged with laches touching the ground upon which his claim is now based. He became satisfied that he could not afford to pay for the Wellington even the amount of the two encumbrances; the property was sold under the trusts and bid in by Wardman, and the actual net result has been that Forrest has lost the properties he conveyed and the money he paid in exchange for the Wellington, and has received nothing in return except the net income from the Wellington during the twenty months of his occupancy.

The story of the Wellington itself is an interesting disclosure in real estate transactions. Wardman bought the land on which the Wellington was built for $29,500. He borrowed of

Swartzel, Rheem, & Hensey to pay for the land and erect a building the sum of $90,000, giving them a first trust thereon, not for $90,000, but for $100,000. The building may have cost Wardman, according to the best evidence we have, between $80,000 and $90,000. If we assume it to have cost him $85,-000, the building and the land together cost him about $115,-000, aside from the value of his own services in superintending the construction, and the $10,000 exacted as compensation for the building loan. Competent witnesses testified that the property was worth something like $120,000 and we are satisfied that no fair valuation could place it higher than the amount of the two encumbrances. We do not understand the case is to be disposed of, or that it need be disposed of on the ground that Moore & Hill, through Beall, acting as Wardman's agent, misrepresented the value of the property; but, it must be remembered, the representations in this case were made by one whom Forrest regarded and had a right to regard as his own agent, while in fact that agent was acting in the interest of the other party to the contract. This might alter the ordinary rule that representations of value made by the seller are matters of opinion only, and not to be relied upon by the purchaser, for the law would probably not tolerate the action of the seller in procuring the buyer's agent to misrepresent the value to the buyer. Moore & Hill have been dismissed from the case by the complainant's electing to proceed against them in an action at law, based upon the same grievance as that relied upon in this case. The question is whether Wardman is to be held, and if so, in what amount. The facts which have been recited in this opinion make it unnecessary to enter into any discussion of the law upon the first part of that question. It would be a disgrace to the law if it were necessary to cite any authorities to show that a defendant who has been found to have secretly purchased the services of the complainant's agent in effecting an exchange of properties between the complainant and the defendant is legally and equitably responsible and liable to make good to the complainant whatever loss the complainant has legally or equitably sustained. That is what the

defendant Wardman has done. If the properties transferred to him were still in his power to restore, there can be no doubt that a court of equity would have power and right to order the reconveyance. In this case, however, the properties have passed out of the hands of Wardman. They were equities, and what the present situation of the properties may be in which those equities existed, and what other encumbrances there may be upon them now,—who may be the present holders of the title,—the record does not disclose, and we need not trouble ourselves to inquire. Wardman has been reinstated, or rather, he has reinstated himself in the property with which he parted, except for such adjustment as equity may require in respect to the income from the property while Forrest was in possession.

This brings us to the second question. Since right must be done the complainant by the payment of money, what ought to be the measure of the complainant's recovery?

The law is clear and well-established that when properties are exchanged at agreed values, and one party to the exchange has so conducted himself in the transaction as to give the other party a right to have the contract set aside, and at the same time has put it out of his own power to place the aggrieved party *in statu quo,* he may be compelled to respond in damages; and where equity has taken jurisdiction of the cause upon proper grounds, the damages will be ascertained and awarded in equity to avoid circuity of action. The measure of damages is the same as in an action at law, based upon a rescission. If the property that was received by the complainant has been disposed of by him before he was aware of the facts that gave him a right to rescind, and the property with which he parted has been disposed of by the defendant, the measure of damages will be the difference between the values of the two properties. If the property that was received by the complainant has been restored to the defendant while the property that the defendant received from the complainant has been disposed of by the defendant, then the measure of damages will be the value of the property with which the complainant parted when the exchange

was made. The question is one of actual value, not of the value agreed upon between the parties for the purpose of the exchange. The complainant is entitled to his actual damages only, not to "the fruits of an unrealized speculation." Standing upon a rescission, he is not entitled to the profit of his bargain. Fraudulent representations made by the defendant, touching the condition or quality of the property, cannot be used to enhance the damages, but only to prove the deceit which entitles the complainant to rescind and recover his actual damages. Such is the rule in the Federal courts as enunciated in *Smith* v. *Bolles,* 132 U. S. 125, 33 L. ed. 279, 10 Sup. Ct. Rep. 39, 16 Mor. Min. Rep. 159, and reaffirmed upon careful consideration in *Sigafus* v. *Porter,* 179 U. S. 116, 45 L. ed. 113, 21 Sup. Ct. Rep. 34. The contrary rule, which holds the defendant to the price at which he has induced the complainant to part with his property, and makes him liable for his misrepresentations touching the quality and condition of his own property by holding him for the difference between the actual value of the property he sold and its value as it would have been had his representations been true, is a rule which has much reason and authority in its support, as shown by the cases cited on the complainant's brief and by others that might be cited; but we are, of course, bound to follow the Federal rule thus clearly announced and settled.

In the present case the property that was received by the complainant has gone back into the hands of the defendant, the defendant having bid it in at the mortgage sale at a price that released the complainant from the second trust. The situation is thus practically the same as if it had been restored to and accepted by the defendant. It follows that the plaintiff is entitled to recover his cash payment of $1,000 and the actual value of his interest in the properties conveyed by him to Wardman & Bones, with interest upon the whole from the 25th day of October, 1909, diminished by the net income received by him from the Wellington while the same was in his possession. The decree below, which was in favor of the defendants, must be reversed, and the cause remanded for further proceedings in

which the complainant's damages shall be ascertained in accordance with the rule here stated, the record before us not affording sufficient evidence for the determination of such damages by this court.

The decree is *reversed* with costs and the cause *remanded.*