## In re CHECKING ACCOUNT OVERDRAFT LITIGATION.

**Case No. 1:09–MD–02036–JLK.**

United States District Court, S.D. Florida. Miami Division.

Signed June 8, 2015.

See, also, 307 F.R.D. 630, 2015 WL 3551527.

15. The Court will separately address the procedure for providing notice to class members regarding the certification of the class and these claims.

David M. Given, Phillips, Erlewine, Given & Carlin, LLP, San Francisco, CA, for Plaintiff.

Ashley Simonsen, Philip A. Scarborough, Cortlin H. Lannin, David M. Jolley, Sonya Diane Winner, Covington & Burling LLP, San Francisco, CA, Michael P. Beder, Emily Johnson Henn, Covington & Burling, LLP, Washington, DC, Barbara J. Dawson, Robert Matthew Kort, Snell & Wilmer LLP, Phoenix, AZ, Barry Rodney Davidson, Jamie Zysk Isani, Hunton & Williams LLP, Miami, FL, Brian J. Meenaghan, Ronald E. Beard, Rudy Albert Englund, Tara N. Gillespie, Lane Powell PC, Seattle, WA, Elizabeth S. Pehrson, Covington & Burling LLP, Redwood Shores, CA, Eric C. Bosset, Covington & Burling, LLP, Wasington, DC, Jay Earl Smith, Smith Larsen & Wixom, Las Vegas, NV, Laurence J. Hutt, Arnold & Porter LLP, Los Angeles, CA, Tracy L. Ashmore, Holme Roberts & Owen LLP, Denver, CO, for Defendant.

### ORDER AND OPINION GRANTING CLASS CERTIFICATION

JAMES LAWRENCE KING, District Judge.

THIS CAUSE is before the Court upon Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law (DE 3198) (the "Motion"). The Court has carefully considered the Motion, response, reply, supplemental memoranda, and the documents attached to them, as well as the parties' voluminous evidentiary submissions and the oral argument of counsel. The Court grants the Motion, for the reasons explained more fully below.

### INTRODUCTION

Plaintiffs allege that, through the use of specially designed software, Wachovia Bank, N.A., now known as Wells Fargo Bank, N.A. ("Wachovia" or the "Bank"), engaged in a systematic scheme to extract the greatest

possible number of overdraft fees from Plaintiffs and similarly situated consumers across the country. Through the use of this software, Wachovia allegedly collected billions of dollars in excessive overdraft fees, much of it from its most vulnerable customers. Plaintiffs allege that Wachovia disseminated uniform misrepresentations and manipulated debit card transactions by, among other things, paying items even when accounts lacked sufficient funds and employing a bookkeeping device to post debit card transactions from highest-to-lowest dollar amount. Through Wachovia's use of this standardized computer software, these alleged account manipulations were applied in the same manner to all Class members, which caused customer accounts to be depleted more rapidly and resulted in more overdrafts and, consequently, more overdraft fees. Plaintiffs additionally claim that, in many instances, fees were imposed at times when, but for Wachovia's manipulations, there were sufficient funds in the consumers' accounts to cover the transaction.

Plaintiffs have offered evidence showing that Wachovia did not disclose its manipulations, took active steps to keep elements of this scheme secret, misled its customers, and engaged in these manipulations despite recognizing that the scheme harmed its customers. This includes evidence that at all times during the proposed Class Period, Wachovia uniformly (i) listed debits in low-to-high order in monthly account statements it sent Class members and in account information made available online and (ii) touted to customers that they could track their accounts in real time online. Wachovia disputes that it has committed any violations of law.

Plaintiffs now seek certification of their common law claims for breach of contract, including breach of the contractual duty of good faith and fair dealing, unjust enrich-ment, and unconscionability, as well as statutory consumer protection claims under the laws of California and New Jersey.

## FACTUAL BACKGROUND [1]

Without making conclusive findings of fact at this pretrial stage, the following record evidence is material to the Court's rigorous analysis of the class certification requirements.

Wachovia merged with Wells Fargo Bank, N.A. effective January 1, 2009, but continued to do business under the Wachovia name as a division of Wells Fargo.[2] Before the merger, Wachovia was a wholly-owned subsidiary of Wachovia Corporation and operated in twenty-one states and the District of Columbia. In 2001, the then-existing Wachovia Bank merged into the larger First Union Corporation, retaining the Wachovia name (Ex. 1 at 79:23–80:2). At the time Wachovia and First Union merged, Wachovia posted debit transactions from lowest to highest dollar amount, while First Union posted debit transactions from high-to-low. Ex. 6 at 0100064. Thereafter, the new Wachovia posted all debit transactions from highest to lowest dollar amount. Ex. 7 at 19:13–24. This re-sequencing was formulaic, automated, and applied to all debit transactions. *Id.*

Debit card transactions are first authorized by Wachovia's computer system, known as "EZ" when a customer tries to use a debit card. Ex. 8 at 0024406–07; Ex. 9 at 0042827. EZ then compares the transaction amount to a balance calculated in "real-time." Ex. 10 at 061934–38. If the account lacks sufficient funds, EZ determines whether to authorize the transaction and overdraw the account based on a cap set by the customer's "shadow" line of credit. *Id.* at 0061955–60; *see also* Ex. 9 at 042828–30. As the name implies, the "shadow" line of credit was only

1. At this stage, the Court makes no determination as to whether Plaintiff will ultimately prevail in conclusively establishing the facts contained herein. The factual background presented here is simply based on the record as it currently stands.

2. Ex. 1 at 21:18–23:7. Wachovia and Wells Fargo transferred Wachovia "legacy" accounts to Wells Fargo computer systems. Until transfer, a Wachovia account was subject to Wachovia practices and agreements. After transfer, Wells Fargo practices and account agreements applied. Ex. 2 at 14:15–25. References to "Ex." are to exhibits attached to Appendix III found at Dkt. No. 3198–3 through 3198–88.

known to Wachovia and was not disclosed to its customers.

Each authorized transaction is immediately subtracted from the "available balance"—a term of art used by Wachovia to describe the actual balance minus certain approved but unpaid transactions—but does not immediately post to the account. Rather, the posting process takes place each weeknight after midnight. Ex. 11 at 16:20–17:2. After credits are posted, Wachovia's software reordered debit card transactions from highest to lowest, and then posted those transactions in two rounds. Ex. 12 at 0033507–08; Ex. 13 at 51:9–22. Round one was for transactions covered by sufficient funds. *Id.* Round two then ran for transactions that overdraw the account; the number and amount of overdraft fees is determined during round two. *Id.*

Plaintiffs' evidence shows that Wachovia deliberately adopted and then repeatedly enhanced its high-to-low posting to increase the number of overdrafts so as to generate more overdraft fee revenue. Prior to its merger with Wachovia, First Union's practice was to decline debit card transactions if there was an insufficient available balance to cover the requested transaction. In 2002, the new Wachovia instituted a program it called "authorization into overdraft," under which the bank authorized transactions that exceeded a customer's balance. Internally, Wachovia acknowledged that this new program was adopted solely to increase overdraft revenue. Ex. 20 at 0098556 (citing $30 million in additional fees, based on 84,000 additional overdraft items per month, as the only "benefit" of the program). Throughout the Class Period, the entire process of authorizing accounts into overdraft using this "shadow line of credit" was completely automated for all Class members and did not involve any manual decision making. Ex. 1 at 235:6–236:9. Furthermore, the practices used to enhance overdraft revenue were uniform in all states in which Wachovia did business. *Id.* at 189:9–192:14 (explaining Ex. 17 at 0116655).

Between 2001 and 2008, Wachovia launched a number of initiatives to the way transactions were posted that were designed to increase overdraft revenue.[3] For example, in 2003, Wachovia began allowing customers to overdraft at ATMs, and projected this change would increase annual overdraft revenue by $20–40 million. Ex. 71 at 313275; Ex. 15 at 0117034; Ex. 72 at 312579–81. In late 2003, Wachovia began the process of reducing the number of transaction groups or "buckets" into which transactions are categorized at posting so as to achieve a "truer" high-to-low posting, and projected this change would increase annual overdraft revenue by $60–80 million. Ex. 71 at 313276; Ex. 73 at 313647–48; Ex. 74 at 314732. In early 2004, Wachovia instituted a "Priority Posting" initiative designed to result in a more true "high to low" posting process. Ex. 15 at 0117034. This enabled Wachovia to merge a greater number of transaction codes into a single bucket and process them in descending order by dollar amount. *Id.; see also* Ex. 16 at 0031920; Ex. 70. Wachovia calculated this enhancement to have resulted in increased revenue of $90–100 million each year. Ex. 15 at 0117034.

By January 2008, an internal Wachovia memorandum boasted that its new posting processes had turned overdraft fees "from a P & L line item to a profitable $17 B[illion] business line." Ex. 17 at 116654. By 2008, Wachovia projected over $1.6 billion in annual overdraft fee revenue net of any refunds. Ex. 14 at 0054762. Overdraft fees ultimately became the single largest source of revenue for Wachovia's Retail Banking Group. Ex. 47 at 0117031.

With each initiative, Wachovia made it more likely that customers' balances would be depleted as quickly as possible, resulting in more overdraft charges than if the same transactions had been posted in any order other than high-to-low. Ex. 17 at 116654. Wachovia's contemporaneous internal documents show that Wachovia closely tracked the amount of revenue derived from each initiative associated with re-sequencing transactions to generate overdraft fees and affirmatively designed initiatives to "encourage overdraft behavior" in its customers. Ex. 17; *also* Ex. 76 ("The purpose of hiring

---

**3.** *See, e.g.,* Exs. 15, 71, 72, 73, 75, 76.

the vendor to do the enhancement is to allow the 'right customers' to overdraw more into overdraft'").

Wachovia meticulously researched the demographics of customers who were assessed overdraft fees. Ex. 49 at 0117238–44; Ex. 50 at 0120879–91. Wachovia found that much of its overdraft revenue came from a very small group. For instance, in 2003, Wachovia concluded that 2.6% of its customers generated 63% of the Bank's overdraft revenue. Ex. 51 at 0097572. It found that "[l]ow and moderate income levels" produced more than average overdraft revenue. Ex. 48 at 0116475. In 2006, Wachovia found that nearly 45% of its overdraft revenue came from only 200,633 (or approximately 2%) of its customers. Ex. 52 at 0030457.

Contemporaneous internal documents also show that Wachovia knew its customers did not understand its overdraft practices and show the lengths to which Wachovia went to hide its overdraft practices from its customers. *E.g.*, Exs. 17, 84 at 0121201. In seeking methods to enhance overdraft revenue, Wachovia explicitly directed its business groups to "select initiatives that do not require customer disclosure." Ex. 71 at 313274. When it expanded customers' ability to overdraft their accounts using ATMs, some at Wachovia documented concerns noting that it was initiating a basic change without telling customers, but Wachovia ultimately decided "we need the fee money so we will still be moving forward." Ex. 75.

Wachovia's written agreements with its customers studiously avoided accurate descriptions of overdraft practices. Its Deposit Agreement says little about how Wachovia would actually post debit card transactions and impose multiple overdraft fees. For example, from 2002 through 2004, the section of the Deposit Agreement addressing payment and posting practices merely stated that Wachovia "may pay checks or other items ... in any order determined by us even if paying a particular check or item results in an insufficient balance to pay one or more other items that otherwise could have been paid out of your account. Without prior notice to you, we may change the order in which we generally pay items." Ex. 22 at 0005143. This language suggested that, at worst, some unspecified form of re-sequencing may deplete the account and cause the bank *not to pay* certain items that otherwise could have been paid. In actuality, Wachovia authorized virtually all transactions—even when the account did not have sufficient funds—and then uniformly re-sequenced the transactions from high-to-low at posting so as to charge fees on more items. In January 2004, the format of the Deposit Agreement changed, although its content remained largely the same. Wachovia added the bolded material below, including a very general statement that "we generally pay larger items first" but "are not obligated to do so":

> We may pay checks or other items drawn upon your account (including those payable to us or on which we may be liable) in any order determined by us, even if **(1)** paying a particular check or item results in an insufficient balance in your account to pay one or more **other checks or** other items that otherwise could have been paid out of your account; **or (2) using a particular order results in the payment of fewer checks or other items or the imposition of additional fees. Although we generally pay larger items first, we are not obligated to do so and,** without prior notice to you, we may change the order in which we generally pay items. [Ex. 26 at 0005358, Sec. D, ¶ 12.]

This paragraph remained unchanged from 2004 through the rest of the Class Period. Plaintiffs detailed the changes Wachovia made to its Deposit Agreement over the years. No change provided additional substantive detail that would alert Wachovia's customers to the fact that Wachovia uniformly re-sequenced transactions from highest to lowest dollar amount and that the customer could be exposed to additional overdraft fees as a result. Exs. 22, 23, 26, 27.

Wachovia's Debit Card Agreement was arguably less informative. The Agreement states "[y]ou may not use your card for a transaction that would cause the outstanding balance in any of your designated accounts to be less than zero unless the account has been previously linked to a designated overdraft account," which can reasonably be read to

imply that overdrafts are simply not allowed. Ex. 25 at 00010, ¶ 4. Plaintiffs showed however, that Wachovia specifically designed its computer systems to allow its customers to use their debit cards for transactions that caused outstanding balances to be less than zero, along with transactions initiated at a time when a customer had a negative balance so that Wachovia could charge overdraft fees.

Most notably, from the time Wachovia began posting transactions from highest to lowest dollar amount, the account statements that Wachovia sent to Class members each month uniformly displayed transactions from lowest dollar amount to highest throughout the Class Period. Transactions were, therefore, reported in precisely the *opposite* order from which Wachovia actually posted the items. Ex. 11 at 9:6–10:1; *see also* Ex. 28. Likewise, online account information that Wachovia made available to its customers deceptively reported transactions in low-to-high order, precisely the opposite order from which Wachovia actually posted the items. *See* Ex. 78.

Throughout the Class Period, Wachovia had the ability to automatically decline a transaction authorization if the available balance was insufficient to cover the transaction, thereby allowing the customer to avoid an overdraft. Ex. 20 at 0098557. But Wachovia actively discouraged its employees from disclosing, let alone marketing, this method of avoiding overdraft fees. In a 2004 memo, Wachovia instructed employees that disabling authorization into overdraft was to be done only at the customer's request, commanding that "[i]t is NOT a point of discussion at account opening." Ex. 29 at 000465 (emphasis in original). Similarly, the option to disable authorizing transactions into overdraft—and thereby avoid virtually all overdraft fees—was omitted from Wachovia's public relations statements, talking points, and training materials. *See* Ex. 30 at 000911; Ex. 31 at 0012603; Ex. 32 at 000189; Ex. 33 at 000417; *see also* Ex. 1 at 250:1–252:1.

Taken together, Wachovia's lack of disclosure and active misrepresentations had the effect of obfuscating the reordering and allied practices that comprised the Bank's money-making scheme. Plaintiffs' expert Arthur Olsen has determined, based on Wachovia's own computerized records, that each of the Plaintiffs was harmed by this high-to-low posting practice and each incurred overdraft fees they would not have incurred if the Bank had either posted transactions chronologically or from low-to-high dollar amount as shown on the statements it sent its customers. Olsen Decl., DE 3198–89, ¶¶ 38–41, 46.

## CLASS CERTIFICATION STANDARDS

■ The Court must undertake a rigorous analysis into whether the Rule 23 prerequisites are met. *Klay v. Humana, Inc.,* 382 F.3d 1241, 1251 (11th Cir.2004). In making the decision, the Court does not determine whether Plaintiffs will ultimately prevail on the merits, but it considers the factual record in determining whether the requirements of Rule 23 are satisfied. *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1188 n. 15 (11th Cir.2003). As the Supreme Court stated, "the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013).

■ Courts "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray,* 208 F.3d 288, 298 (1st Cir.2000). In other words, the Court undertakes "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or are susceptible of common proof equally applicable to all class members." *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 334 (E.D.Mich. 2001) (quoting *Little Caesar Enters., Inc. v. Smith,* 172 F.R.D. 236, 241 (E.D.Mich.1997)).

Rule 23(a) states that a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to

the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). If the Court finds that the criteria of Rule 23(a) are satisfied, it then must also find that the Class fits within one of the three categories in Rule 23(b).

## DISCUSSION

### I. The Class Definition

■ Before considering the express Rule 23 requirements, the Court considers whether a class exists that can adequately be defined. *Singer v. AT & T Corp.*, 185 F.R.D. 681, 685 (S.D.Fla.1998) (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970)). "While the definition of the class must not be vague or difficult to apply, the implicit definition requirement does not require an overly strict degree of certainty and is to be liberally applied." *Singer*, 185 F.R.D. at 685. Plaintiffs' proposed Class consists of:

> All Wachovia customers in the United States who had one or more consumer accounts and who, from applicable statutes of limitation through August 13, 2010 (the "Class Period"), incurred an overdraft fee as a result of Wachovia's practice of sequencing debit card transactions from highest to lowest.
>
> Excluded from the Class are Wachovia; its parents, subsidiaries, affiliates, officers and directors; any entity in which Wachovia has a controlling interest; all customers who make a timely election to be excluded; and all judges assigned to this litigation and their immediate family members.

Plaintiffs also seek the certification of subclasses for specific claims as set forth in their Proposed Trial Plan for Trial of Class Claims (the "Trial Plan"). These subclasses are discussed toward the end of this Order.

■ The Court concludes first that the proposed class definition satisfies the requirements of Rule 23 in that certification does not require a merits determination. The ascertainability or definiteness inquiry, which "ensures that a proposed class will actually function as a class," *Byrd v. Aaron's*

*Inc.*, 784 F.3d 154, 162 (3d Cir.2015), *as amended* (Apr. 28, 2015), is readily satisfied here because the evidence is that Class members can be identified from Wachovia's own records. *Id.* (ascertainability does not require "that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified' ") (citation omitted). Plaintiffs propose to have their expert, Arthur Olsen, mine Wachovia's data to determine who the members of the Class are, just as he has done numerous times before in this MDL as well as in the California Wells Fargo case. This method of determining class membership has been accepted by other courts. *See Sadler v. Midland Credit Mgmt.*, 2009 WL 901479, at *2, 2009 U.S. Dist. LEXIS 26771, at *4–5 (N.D.Ill. Mar. 31, 2009) (automated query of defendants' database would yield "objective criteria" necessary to ascertain the class); *Stern v. AT & T Mobility Corp.*, 2008 WL 4382796, at *5, 2008 U.S. Dist. LEXIS 110305, at *12–13 (C.D.Cal. Aug. 22, 2008) (defendants' business records provided sufficient information to identify individuals who purchased cellular telephone service and were enrolled in either one of the challenged services without ever having requested the service); *In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 673066, at *12–13, 1999 U.S. Dist. LEXIS 13228, at *34–35 (E.D.Pa. Aug. 26, 1999) (finding class definition adequate because there were reliable means to determine who had actually taken the drug where fact sheets, prescription records, and records of medical treatment were available to verify consumption); *also Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir.1978), *aff'd sub nom. Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). This Court has accepted this method also. *E.g., In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 650–51 (S.D.Fla.2012) (*"Comerica "*); *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 680 (S.D.Fla.2011) (*"Union Bank "*), *pet. for leave to appeal denied*, No. 11–90012 (11th Cir. Oct. 7, 2011).

■ The crux of Wachovia's ascertainability challenge is that Plaintiffs have not identified a baseline posting order for comparison

purposes. However, Plaintiffs allege that all customers who were charged additional overdraft fees, as compared to what they would have been charged under a *low-to-high* posting practice, were harmed by Wachovia's high-to-low reordering scheme. *See* Reply in Support of Class Certification, DE 3372 at 5–9. Wachovia utilized low-to-high posting for debits before it switched to high-to-low posting with its 2001 merger with First Union Bank (Ex. 6 at 0100064). A trier of fact could reasonably find that this is the proper baseline. First, it is the posting order Wachovia showed its customers on their monthly account statements. (*See* Exs. 36–43). Second, posting items lowest to highest is the order that minimizes the occurrence of overdraft charges for the benefit of consumers. Thus, the members of the Class are those persons who incurred one or more additional overdraft fees that resulted from the high-to-low posting order that they would not have incurred had the Bank maintained the low-to-high posting order it showed each customer. Comparing the results of high-to-low sequencing (which yields the greatest number of overdraft fees) to low-to-high sequencing (which yields the lowest number of overdraft fees) defines the outer parameters of the Class, generating the largest group affected by the high-to-low practice within the meaning of the Class definition. And Plaintiffs' expert Mr. Olsen can determine exactly who these Class members are using the Bank's own data.[4] The Court finds that this Class definition is precise, objective, and properly tailored to the underlying conduct at issue.

The composition of the Class, and those persons bound by the judgment, will not vary if the trier of fact ultimately decides that a less consumer-friendly posting order than low-to-high is appropriate, or even that a high-to-low posting order is consistent with the Bank's contractual and other obligations. 7A Wright, Miller & Kane, *Federal Practice & Procedure: Civil 3d* § 1760 (3d ed. 2005) ("If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist."). This subsequent determination of the good-faith posting order will affect, if anything, the amount of damages only. *Klay*, 382 F.3d at 1259–60 ("[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.") (footnotes omitted).[5] Plaintiffs have shown that for each permutation the resulting damages can be calculated by Mr. Olsen.

■ Wachovia also claims the Class definition is impermissibly vague because its start date is tied to the applicable statutes of limitation instead of to a specific date. However, courts commonly certify classes with start dates linked to the statute of limitations where, as here, the challenged conduct predates the relevant limitations periods. *E.g.*, *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1263 (11th Cir.2009) (court did not take issue with definition of class period as beginning with the "commencement of the statute of limitations through the date that the Court certifies this suit as a class action"); *Comeri-*

---

4. This Court has found the analysis of Plaintiffs' expert Arthur Olsen admissible on several prior occasions in other cases involving overdraft fees. Wachovia has challenged the admissibility of Mr. Olsen's analysis. Those arguments are addressed in a separate order. Plaintiffs have asserted, however, that some of Wachovia's arguments based on Mr. Olsen's preliminary calculations of the named Plaintiffs' accounts were based on data that Wachovia did not produce as it was normally kept but was instead manipulated in the course of production. *See* DE 3372 at 72–74. The Court will take up this question also at a later date. The Court notes that even if any manipulation was inadvertent, Wachovia's effort to challenge Mr. Olsen based on its own mistakes was improper.

5. This principle remains true after *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). "The presence of individualized damages issues would not change this result [i.e., certification]. Class-wide proof is not required for all issues." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir.2014); *see also Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801–02 (7th Cir.2013). Indeed, "nothing" in *Comcast* even "mandates a formula for class-wide measurement of damages in all cases," *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir.2014), although Plaintiffs have put forth a workable formula here.

*ca,* 286 F.R.D. at 650–51; *Union Bank,* 275 F.R.D. at 680–81; *Nelson v. Mead Johnson Nutrition Co.,* 270 F.R.D. 689 (S.D.Fla.2010) (certifying class defined as "[a]ll Florida consumers who purchased Enfamil® LIPIL® within the applicable statute of limitations"); *North Jackson Pharm., Inc. v. Express Scripts, Inc.,* 2006 WL 6625864, at *5–6, 2006 U.S. Dist. LEXIS 98774, at *18–20 (N.D.Ala. Mar. 3, 2006) (class certified where class period beginning date was based on when limitation period began to run).

Thus, because membership in the Class is reasonably defined through objective criteria, the Court finds that the Class exists and is ascertainable.

## II. Rule 23(a)

### A. Numerosity

 The first requirement of Rule 23(a) is that a class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "[A] numerical yardstick is not the determinant for class certification; rather a court should examine the numbers involved to see if joinder of all is impossible or impracticable." *Hastings–Murtagh v. Texas Air Corp.,* 119 F.R.D. 450, 459 (S.D.Fla.1988). Parties seeking class certification need not know the "precise number of class members," but they "must make reasonable estimates with support as to the size of the proposed class." *Fuller v. Becker & Poliakoff, P.A.,* 197 F.R.D. 697, 699 (M.D.Fla.2000). The Eleventh Circuit has held that "[g]enerally, less than twenty-one is inadequate, more than forty adequate." *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 490 (S.D.Fla.2003) (quoting *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir. 1986)).

 Although the exact number of Class members here is not presently known, it appears to run in the millions, making joinder of them all impracticable if not impossible. Wachovia does not seriously contest numerosity except to argue that the arbitration clause in its form contract defeats numerosity by requiring the absent Class members to submit to arbitration, leaving only the named Plaintiffs in these cases. But the arbitration clause in Wachovia's account agreement is permissive, not mandatory. *See Garcia v. Wachovia Corp.,* 699 F.3d 1273, 1275 (11th Cir.2012). As such, the absent Class members are not bound to arbitrate all claims arising under this agreement. Wachovia relies on *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718 (11th Cir.1987), but the arbitration agreements in that case, by contrast, *"requir[ed]* the arbitration of 10b–5 claims" under the Securities Exchange Act. *Id.* at 725 n. 5 (emphasis added). Here, each party instead has the right to request arbitration should they choose to do so. Permissive arbitration clauses are not self-executing. *See* DE 2224, p. 2. By its own choosing then, Wachovia adopted a permissive arbitration clause which requires the Bank to request arbitration as to Class members.

The absent Class members, however, are not before this Court until the point of certification—not until then are they parties. As the Eleventh Circuit held in the most recent appeal of these cases, "Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power." *In re Checking Account Overdraft Litig.,* 780 F.3d 1031, 1037 (11th Cir.2015). Thus, Wachovia's arbitration-based argument is premature given the permissive nature of these agreements and the stage of this litigation. In short, Wachovia has not yet requested to invoke arbitration under its permissive agreement and its premature assertion of the arbitration clause cannot defeat numerosity here.

Although the exact number of Class members is not presently known, Wachovia's discovery responses indicate that the proposed Class is comprised of hundreds-of-thousands, if not millions of Wachovia customers, making joinder of them all impracticable if not impossible. In December 2007 alone, over 330,000 unique Wachovia consumer checking accounts were assessed two or more overdraft fees on a single day—solely in the states of Florida, California, Georgia, Mississippi, North Carolina, New Jersey, and Texas.[6]

---

6. *See* Ex. 67; *see also* Ex. 49 at 0117242 (track-

ing overdraft revenue for a single week and not-

Accordingly, the Court finds that the numerosity requirement of Rule 23 is satisfied.

## B. Commonality and Typicality [7]

 Rule 23(a)'s commonality prerequisite requires that there be at least one issue common to all members of a class. The "commonality" requirement of Rule 23(a)(2) is a "low hurdle easily surmounted." *Rolland v. Patrick*, 2008 WL 4104488, at *4 (D.Mass. Aug. 19, 2008); *see also Cheney*, 213 F.R.D. at 490 (commonality threshold is "not high"). It only requires "at least one issue common to all class members." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 604 (S.D.Fla.2003) ("Plaintiffs' legal claims need not be completely identical and factual differences concerning treatment or damages will not defeat a finding of commonality.") The commonality element is generally satisfied when a plaintiff alleges that "[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 687 (S.D.Fla.2004); *see also In re Recoton Corp. Secs. Litig.*, 248 F.R.D. 606, 616, 618 (M.D.Fla.2006).

Relying on *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), Wachovia contends that Plaintiffs have not satisfied the commonality requirement. In *Dukes*, the Supreme Court decertified a Rule 23(b)(2) class consisting of 1.5 million current and former employees of Wal–Mart. The Court held that the plaintiffs failed to satisfy the commonality requirement because they "provide[d] no convincing proof of a companywide discriminatory pay and promotion policy," *id.* at 2557, and without such proof, it would have been impossible to arrive at a common answer to the question of why each class member was disfavored, which was the

"crux of the inquiry" for the plaintiffs' Title VII claims in that case. *Id.* at 2552.

Unlike the plaintiffs in *Dukes*, these Plaintiffs have submitted evidence of a common corporate policy or practice, namely, Wachovia's systematic, computerized, and uniform manipulation and reordering of debit card transactions, its development and implementation of the "shadow" line of credit practice, and its misrepresentations of its overdraft practices, all to increase the number of overdraft fees imposed. Plaintiffs provided substantial evidence of Wachovia's uniform overdraft scheme, thereby satisfying the commonality and typicality standards. "Of course, when a group of plaintiffs suffer under a uniform policy, the commonality test is often satisfied, even after *Dukes*." *Oakley v. Verizon Communications, Inc.*, 2012 WL 335657, at *14 (S.D.N.Y. Feb. 1, 2012). The Court finds that common questions of fact and law apply to all Class members and will drive the resolution of this litigation. *Dukes*, 131 S.Ct. at 2551. Such questions include whether Wachovia:

- Disclosed and/or refused to allow its Class members to opt out of the overdraft protection program;
- Alerted Class members that a debit card transaction would trigger an overdraft fee if processed and provided them with an opportunity to cancel the transaction;
- Manipulated and reordered transactions in order to increase the number of overdraft fees imposed;
- Imposed overdraft fees when, but for resequencing, there would be sufficient funds in the account;
- Failed to provide Class members with accurate balance information;
- Delayed posting transactions so that Class members were charged overdraft fees even when sufficient funds were in

ing overdraft occurrences).

**7.** The typicality and commonality requirements are distinct but interrelated, as the Supreme Court has noted: " 'The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class

claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.' " *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir.2004) (quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006)).

the account to cover the transactions; and

- Breached its covenant of good faith and fair dealing with Plaintiffs and the Class; engaged in practices that were substantively and procedurally unconscionable; was unjustly enriched at the expense of Plaintiffs and the Class; and violated the unfair and deceptive trade practices acts of certain states.

■ The Court finds that, based on the evidence presented, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class members.[8] Pursuant to a standardized, automated process, Wachovia systematically re-sequenced debit transactions from high-to-low for all Plaintiffs and Class members. Plaintiffs and the Class were subjected to Wachovia's misleading transaction history and inaccurate balance information. All Plaintiffs and Class members had accounts that were governed by common and materially uniform agreements. When the trier of fact decides whether Wachovia's uniform high-to-low reordering, which applied to all of its customers in the same way, was improper, the trier of fact will thereby "generate [a] common answer" that "will resolve an issue that is central to the validity of [Plaintiffs'] claims in one stroke." *Dukes*, 131 S.Ct. at 2551.

Wachovia's alleged scheme, moreover, entailed more than just the high-to-low posting order. The "shadow" line of credit practice, together with the uniform misrepresentations about how the Bank was processing debit card transactions, combined to cause more overdrafts and greater revenue for the Bank, while failing to inform Plaintiffs as to what was happening with their accounts. These practices were integral to the scheme, and they involve common issues which implicate common proof. It has long been true that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action," and such is the case here. *See* Fed.R.Civ.P. 23(b)(3) advisory committee note (1966).

■ Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The typicality test centers on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Although similar to commonality in that it concentrates on the "nexus" between class members and their designated representative, typicality differs from commonality in that it focuses on the class representative's individual characteristics in comparison to those of the proposed class. *Piazza v. EBSCO Indus. Co.*, 273 F.3d 1341, 1346 (11th Cir.2001); *Prado–Steiman v. Bush*, 221 F.3d 1266, 1269 (11th Cir.2000). Typicality is satisfied where the named plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985); *see also SCI Funeral Servs.*, 212 F.R.D. at 604–05; *Pottinger v. Miami*, 720 F.Supp. 955, 959 (S.D.Fla.1989).

■ "The test for typicality, like commonality, is not demanding." *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D.Fla.1996). Neither typicality nor commonality requires that all putative class members share identical claims, and both may be satisfied even if some factual differences exist between the claims of the representative and represented parties. *Kornberg*, 741 F.2d at 1337; *Prado–Steiman*, 221 F.3d at 1279 n. 14.

Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.... Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theo-

8. These facts are referenced in greater detail in the discussion of predominance below.

ries. Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.

*Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (citations and alterations omitted); *see also Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985) (strong similarity is sufficient for typicality, even where factual differences exist). To defeat typicality, the factual variation presented by a class representative's claim "must be clear and must be such that interests of the class are placed in significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D.Fla.1996).

 The common issues arising from Wachovia's alleged overdraft scheme are shared by Plaintiffs and the Class, and there is no material factual variation that would place the interests of the Class in jeopardy. Courts have regularly found that typicality is satisfied where a defendant has engaged in a common course of misrepresentation or concealment, even where class representatives were not subject to identical contracts. *See Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321, 328 (S.D.Ohio 2009); *Demmick v. Cellco P'ship*, 2010 WL 3636216, at *7–9, 2010 U.S. Dist. LEXIS 94041, at *19–25 (D.N.J. Sept. 8, 2010); *Fischler v. AmSouth Corp.*, 176 F.R.D. 583, 585–86 (M.D.Fla.1997).

 Wachovia claims that Plaintiffs have different expectations and preferences in posting order and cannot be typical of the Class. Yet it is the defendant's common course of conduct, not the class representatives' subjective expectations or preferences, that governs considerations of typicality. *See Johnson v. GEICO Cas. Co.*, 673 F.Supp.2d 255, 275–76 (D.Del.2009); *Marcus v. BMW N. Am., LLC*, 2010 WL 4853308, at *5–6, 2010 U.S. Dist. LEXIS 122908, at *16–17 (D.N.J. Nov. 19, 2010). Plaintiffs and the members of the Class are all challenging the same overdraft policies of Wachovia and seeking to recover the additional overdraft fees they incurred as a result of the resequencing of their transactions. This is true irrespective of the cause of action alleged.

Wachovia contends that Plaintiffs' claim for breach of the contractual covenant of good faith and fair dealing requires an assessment of individual expectations. To the extent expectations are relevant, however, an objective standard governs; individual expectations are irrelevant. *See Union Bank*, 275 F.R.D. at 680 ("For example, it is not the case that the individual Plaintiffs' and class members' subjective expectations are necessary to prove their claims. To the contrary, breach of the covenant good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct"); *Comerica*, 286 F.R.D. at 657. The Restatement recognizes that "[s]uch a writing is interpreted wherever reasonable as treating alike all those similarly situated, *without regard to their knowledge or understanding of the standard terms of the writing.*" RESTATEMENT (SECOND) OF CONTRACTS § 211(2) (1981) (emphasis added). Hence, that some customers might have superior knowledge is immaterial. "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it. The result may be to give the advantage of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute." *Id.* at cmt. e. This claim can be established by common proof of Wachovia's uniform application of high-to-low posting and related devices like the "shadow" line to the members of the Class and the Bank's concealment of its overdraft practices that affected Plaintiffs and the Class alike.

Differences in the degree of customer awareness do not establish atypicality here. Plaintiffs allege that Wachovia's concealment of its overdraft policies prevented both Plaintiffs and the Class members from gaining sufficient knowledge to understand Wachovia's scheme and how it could affect them. Some customers' knowledge of Wachovia's high-to-low posting order alone, without awareness of Wachovia's "shadow" line of credit and other practices described above (which Wachovia uniformly concealed from

customers), does not bar class certification. The evidence regarding Wachovia's scheme, including its uniform misrepresentations and concealment of its overdraft practices, renders Plaintiffs' unjust enrichment and unconscionability claims typical of the Class claims. *See Spencer v. Hartford Fin. Servs. Group, Inc.,* 256 F.R.D. 284, 291 (D.Conn.2009).

Wachovia also cites supposedly divergent customer preferences to argue that damage calculations will differ, and that the identity of the Class members that have been damaged will vary, depending upon the alternative posting order selected. Class membership is discussed above, and will not vary on this basis. Further, as noted above, individual preferences are irrelevant. Differences in the amount of damages suffered by class representatives and the class do not, of course, affect typicality. *Kornberg,* 741 F.2d at 1337.

The posting practices that First Union used before its 2001 merger with Wachovia, the posting practices of the different banks that were merged into Wachovia during the Class Period, and the practices Wells Fargo used after its merger with Wachovia in 2009 do not render Plaintiffs' claims atypical. These variations simply do not impact the proposed Class, which is defined to include only customers who "incurred an overdraft fee as a result of *Wachovia's* practice of sequencing debit card transactions from highest to lowest" (emphasis added). Customers were only subject to Wachovia's practices while their accounts were maintained on Wachovia's systems. Thus, overdrafts caused by the practices of predecessor and successor banks are not within the scope of this case and any variations in posting practices prior to the First Union merger, after the Wells Fargo merger, or at other banks that merged with Wachovia do not affect common issues.

Neither does the fact that Wachovia launched a succession of initiatives crafted to deplete customers' balances more quickly, and to thereby increase the likelihood that customers would overdraft their accounts, defeat commonality. While the various "enhancements" Wachovia instituted increased revenue and harmed Class members at an ever-increasing rate, the automated and systematic nature of Wachovia's posting practices remained the same.

From the time it merged with First Union in 2001 until after the close of the Class Period, Wachovia continually posted all debit transactions from highest to lowest dollar amount in a formulaic and automated manner.[9] Each night, Wachovia's software batched transactions by type and then reordered them from highest to lowest and exacted overdraft fees for each transaction that exceeded a customer's balance after it had been drained by the previous days' largest transactions.

The fact that Celia Spears–Haymond had her account closed with a negative balance does not make her atypical of the Class. Many other Class members also had their accounts closed—in part because of the Bank's scheme that triggered a slew of fees. Moreover, to the extent it may be appropriate to offset damages based on such "charged off" amounts, those amounts can readily be applied as an offset or to reduce the amount the account holder may owe. *See, e.g., Spicer v. Chicago Bd. Options Exchange, Inc.,* 844 F.Supp. 1226, 1236 (N.D.Ill. 1993); *Carbajal v. Capital One, F.S.B.,* 219 F.R.D. 437, 441 n. 2 (N.D.Ill.2004) ("[T]here is no reason to believe that [setoffs] would end up as a significant focus of the case; the setoff would likely involve nothing more than a mere calculation."). Defenses "(such as setoff) pertain (if at all, to a merits determination to be made later) to damages, and can be accounted for in Plaintiffs' expert's calculations." *Comerica,* 286 F.R.D. at 660; *In re Checking Account Overdraft Litig.,* 281 F.R.D. 667, 678 (S.D.Fla.2012) (*"TD Bank "*); *Union Bank,* 275 F.R.D. at 677.

Finally, Plaintiffs have proposed discrete multi-state subclasses for some of the state law claims, to ensure that the Class representatives' claims are materially identical to those of all other Class members they represent. The Court addresses below the application of these subclasses, which provide additional assurances of typicality. Based on

9. *See* DE 3198 at 7–8; *also* Ex. 7 at 19:13–24.

the foregoing, the Court finds that the commonality and typicality requirements are met.

## C. Adequacy

■ The Court must also be satisfied that the "representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement is met when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the actions. *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir.2003). Adequacy exists where the named plaintiffs share common interests with the class members and seek the same type of relief for themselves as for the class. *Pottinger*, 720 F.Supp. at 959.

■ The Court is satisfied that the named Plaintiffs will fairly and adequately represent the interests of the Class and each relevant subclass. The central issues here—the existence, consequences, and propriety of Wachovia's scheme to manipulate debit card transactions to increase the number of overdraft fees it could assess—are common to the claims of Plaintiffs and the other members of the Class. Based on the evidence in the record regarding the named Plaintiffs, including their deposition testimony, they each have a strong interest in proving Wachovia's scheme, establishing its unlawfulness, demonstrating the impact of the conduct, and obtaining redress. Wachovia contested adequacy at the class certification hearing on the grounds that, because of the subclass arrangements, some Plaintiffs may end up pursuing only one of the common law claims against the Bank. However, Wachovia cites nothing suggesting a class representative needs to maintain any more than one cause of action in order to properly pursue or secure complete relief for the represented class or subclass. Accordingly, the Court finds that the named Plaintiffs "share the true interests of the class" and are adequate representatives. *Hastings–Murtagh*, 119 F.R.D. at 459; *see also Tefel v. Reno*, 972 F.Supp. 608, 617 (S.D.Fla.1997) (the "common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members.").

The Court is not persuaded that there exists an intra-Class conflict over which alternative posting order should be used to calculate damages. To the extent individual preference with regard to posting order is relevant, there does not appear to be any competent evidence that Class members would prefer a high-to-low posting order over any of the possible alternatives, such as chronological or low-to-high. *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F.Supp.2d 1080, 1105 (N.D.Cal.2010). And if Plaintiffs establish Wachovia's liability, the evidence indicates that most if not all Class members stand to benefit, regardless of the alternative posting order ultimately chosen by the trier of fact, because the bulk of Wachovia's overdraft revenue came from a concentrated population of customers (the ones who lived from paycheck to paycheck). There is no evidence that any Plaintiff lacks incentive to vigorously prosecute these cases on behalf of the Class and the relevant subclasses.

The Court further finds that Plaintiffs' counsel have no interests that are antagonistic to those of the absent Class members and that they have diligently represented their clients and the absent Class members. The law firms seeking to represent the Class here include very qualified and experienced lawyers. The Court has thoroughly reviewed the firm resumes setting forth their experience and expertise in class actions, and notes that their work has consistently been excellent in this MDL. The Court is therefore satisfied that the Plaintiffs and the firms seeking appointment as Class counsel will properly and adequately prosecute these cases.

The Court therefore appoints as Class representatives Anthony Poulin, a resident of New Jersey; Murlee Damor, a resident of New Jersey; Angela Gonzalez, a resident of Florida; Frances Pinckney, a resident of Georgia; Charles Jones, a resident of Texas; Robert Thornton, a resident of Virginia; and Celia Spears, formerly Celia Spears–Haymond, a resident of California. In addition,

the Court appoints the following firms as Class counsel pursuant to Fed.R.Civ.P. 23(g): Podhurst Orseck, P.A.; Bruce S. Rogow, P.A.; Grossman Roth, P.A.; Lieff Cabraser Heimann & Bernstein LLP; Webb, Klase & Lemond, LLC; Trief & Olk; Baron & Budd, P.C.; Golomb & Honik, P.C.; and Hagens Berman Sobol Shapiro LLP.

## III. Rule 23(b)(3)

Plaintiffs bring these actions under Rule 23(b)(3), which requires (i) that questions of law or fact common to class members predominate over any questions affecting individual members, and (ii) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### A. Predominance

■ "Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.' " *Klay,* 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 699 (N.D.Ga. 2001)); *see also Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002) (common issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."). It is not necessary that all questions of law or fact be common; only some questions must be common, and they must predominate over individual questions. *See Klay,* 382 F.3d at 1254; *see also Allapattah Servs., Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir.2003), *aff'd,* 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) ("the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").

■ The predominance inquiry focuses on the number and significance of common issues. It does not require a complete absence of individual issues. *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.), *cert.*

*denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986). Efficiency is the overriding, textually-mandated concern. *Butler,* 727 F.3d at 800. Hence, if the liability issue is shared among the class members, common questions ordinarily will predominate over individual questions. *Singer,* 185 F.R.D. at 690; *see also SCI Funeral Servs.,* 212 F.R.D. at 606 ("In deciding whether common questions predominate under Rule 23(b)(3), courts generally focus on whether there are common liability issues which may be resolved efficiently on a class-wide basis.") (citation omitted); *Cooper v. Pacific Life Ins. Co.,* 229 F.R.D. 245, 263–64 (S.D.Ga.2005) (finding predominance satisfied despite "fact that some individual consideration of customers' unique circumstances would have been necessary" to evaluate their claims, where "class-wide liability exists, if at all, because of the . . . common course of conduct, through misleading omissions . . . and otherwise").

■ Here, "irrespective of the individual issues which may arise, the focus of the litigation" will be "the alleged common course" of unfair conduct embodied in Wachovia's alleged scheme to maximize overdraft fees through the reordering of transactions at account posting. *Sargent v. Genesco, Inc.,* 75 F.R.D. 79, 86 (M.D.Fla.1977). Any analysis of this scheme will depend on evidence relating to the standardized account agreement and overdraft practices affecting all Class members in a uniform manner. Predominance is "a test readily met in certain cases alleging consumer . . . fraud," *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), particularly where, as here, uniform practices and misrepresentations give rise to the controversy. *See, e.g., In re U.S. Foodserv. Pricing Litig.,* 729 F.3d 108, 120 (2d Cir. 2013) (holding that class actions may be reasonably litigated through use of "legitimate inferences based on the nature of the alleged misrepresentations at issue") (quoting *Klay,* 382 F.3d at 1259); *Powers v. Hamilton County Public Defender Comm'n,* 501 F.3d

592, 619 (6th Cir.2007) ("Cases alleging a single course of wrongful conduct are particularly well-suited to class certification.").

The Court finds that predominance is satisfied in this case. Plaintiffs allege that Wachovia's course of conduct commonly, and adversely, affected the entire Class, and submitted extensive evidence supporting that allegation. The Class members are similarly situated with regard to the readily determined, allegedly excessive number of fees they incurred as a result of this standardized process. The Class is unified by both common questions and a common interest. The evidence necessary to establish Plaintiffs' claims is common to the named Plaintiffs and all Class members; all seek to prove that Wachovia's high-to-low re-sequencing practice was wrongful. That evidentiary presentation involves the same evidence of (i) Wachovia's form contracts, with similar terms, applicable to all Plaintiffs and Class members; (ii) Wachovia's systematic re-sequencing of debit transactions from high-to-low for all Plaintiffs and Class members through its automated software programs; (iii) the overdraft limits that Wachovia secretly established for all Plaintiffs and Class members in order to maximize fees and minimize risk to the Bank; and (iv) Wachovia's uniform misrepresentations to its customers that a debit card worked like cash, such that the money would come out of their account right away and they could not spend more than they had.

Wachovia contends that its account agreement was revised over time during the Class Period, that these revisions used varying language to describe posting order, and that these variations defeat commonality. However, this is no impediment to commonality because each contractual change was applicable to all customers, and these variations during the Class Period were minimal. Moreover, without exception, Wachovia's Debit Card Agreement specifically stated that customers could **not** overdraft their accounts using their debit cards unless they previously signed up for overdraft protection. Thus, whether the disclosures in its account agreements sufficed to adequately inform the Class members of Wachovia's practices is a question common to all Class members, and one which predominates over the limited individual issues. *Cf. Gutierrez,* 730 F.Supp.2d at 1116 (merely informing customers that bank posted high-to-low did not fairly disclose *how* that practice could affect the number of overdrafts).

■■■ Unique defenses rarely predominate where a common course of conduct is shown. *Wahl v. Midland Credit Mgmt.,* 243 F.R.D. 291, 297–98 (N.D.Ill.2007); *Demmick v. Cellco P'ship,* 2010 WL 3636216, *7–8, 2010 U.S. Dist. LEXIS 94041, *20–21 (D.N.J. Sept. 8, 2010). Contrary to Wachovia's arguments, there are no unique defenses raised here that could become the focus of this litigation. Wachovia's defenses against Plaintiffs are related to the Class claims and are typical of those that Wachovia will assert against the Class.

As discussed below, Plaintiffs have met their burden of showing that common issues of fact and law will predominate within the subclasses they have proposed for each of their claims. As this Court observed in *Union Bank,* the Court may certify multi-state classes even if "different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court ... can manage by means of" sub-classing. 275 F.R.D. at 679–80 (quoting American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010)); *also Comerica,* 286 F.R.D. at 656; *TD Bank,* 281 F.R.D. at 680–81.

### (i) Breach of the Contractual Covenant of Good Faith and Fair Dealing

■■■ The Court finds that Plaintiffs have appropriately and timely alleged breach of the contractual covenant of good faith and fair dealing in their complaint, the Motion for Class Certification, and the Trial Plan. Further, the Court is not persuaded by Wachovia's objection that individual Class members' subjective preferences for posting order and expectations concerning overdraft fees will undermine the common issues that give rise to Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing. The reasonable expectations of a party to a form contract are judged objectively, from the per-

spective of a reasonable person, making the subjective views of Class members irrelevant.[10] Common issues clearly predominate as to whether Wachovia's high-to-low debit reordering scheme and its allied practices, including the Bank's alleged misleading disclosures, manifest bad faith and violated customer expectations.

### (ii) Unjust Enrichment

██ Unjust enrichment claims can be certified for class treatment where common circumstances bear upon whether the defendant's retention of a benefit from class members was unjust. *See James D. Hinson Elec. Contr. Co. v. Bellsouth Telecomms., Inc.*, 275 F.R.D. 638, 647 (M.D.Fla.2011).[11] That situation exists here. Based on the evidence presented, class-wide proof is available to show that Wachovia deceived its customers through uniform misrepresentations and concealment of important information about its overdraft policy, including the high-to-low reordering, and the existence and the amount of customers' secret overdraft limits. These factors go directly to the justness of Wachovia's retention of the excess overdraft fees it allegedly collected as a result of the money-making scheme.

██ There is general agreement among courts that the "minor variations in the elements of unjust enrichment under the laws of the various states … are not material and do not create an actual conflict." *Pennsylvania Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F.Supp.2d 458, 477 (D.Del.2010). A leading case is *In re Mercedes–Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J.2009) (certifying nationwide class), *and* 267 F.R.D. 113 (D.N.J.2010) (*"Mercedes II"*) (denying decertification motion), *Rule 23(f) pet. denied*, 2010 U.S.App. LEXIS 8087 (3d Cir. Apr. 19, 2010). In *Mercedes–Benz*, the district court undertook a searching analysis of the comparative law of unjust enrichment in the context of class certification, and concluded that "[w]hile there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict." 257 F.R.D. at 58. The court reaffirmed this analysis in *Mercedes II*, 267 F.R.D. at 119–23. This reasoning is persuasive, and courts in this District have reached similar results. In *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 & n. 40 (S.D.Fla.2004), the court certified a multi-state unjust enrichment class, finding that "[t]he standards for evaluating each of the various states classes' unjust enrichment claims are virtually identical" and that minor variation in states' laws "present[ed] no obstacle to class certification." *See also Singer*, 185 F.R.D. at 692 (concluding that the elements of unjust enrichment are "materially the same throughout the United States."). Courts elsewhere are in accord. *See, e.g., In re Abbott Laboratories Norvir Anti–Trust Litig.*, 2007 WL 1689899, at *9–10 (N.D.Cal. 2007) (certifying nationwide unjust enrichment class, finding that "the variations among some states' unjust enrichment laws do not significantly alter the central issue or the manner of proof"). Application of the unjust enrichment doctrine has a "universal thread," *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (D.S.D.2004), and the claim is well-suited for multi-state class treatment by virtue of its uniform availability and focus on the defendant's ill-gotten gain.

Based on the record presently before the Court, *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir.2009), does not counsel against class treatment of these unjust enrichment claims. In *Vega*, different employee-plaintiffs had markedly different levels of knowledge and understanding of the commission

---

**10.** *See, e.g., Parcel Tankers, Inc. v. M/T Stolt Luisa Pando*, 787 F.Supp. 614, 618 (E.D.La.1992); *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.*, 274 F.R.D. 286, 290 (N.D.Cal.2011) ("the reasonable expectations of the class [asserting a good faith and fair dealings claim under Delaware law] are measured by an objective standard"); *Union Bank*, 275 F.R.D. at 680 ("breach of the duty good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct"); *Clancy v. King*, 405 Md. 541, 954 A.2d 1092, 1108 (2008) (under Maryland law, objective standard applies).

**11.** *See also County of Monroe v. Priceline.com, Inc.*, 265 F.R.D. 659, 671 (S.D.Fla.2010); *Cassese v. Wash. Mut., Inc.*, 255 F.R.D. 89, 97–98 (E.D.N.Y.2008).

systems established by the defendant's employment contracts based on information they may or may not have received from the defendant. *Id.* at 1274–75. Here, however, there is no evidence that any Class members learned the true nature and impact of Wachovia's alleged scheme. Mere awareness of the high-to-low posting process is only part of the equation. Unlike in *Vega,* for example, at this stage, there is substantial evidence supporting Plaintiffs' allegation that Wachovia's practices were concealed from its customers. Thus, these cases are like others in which certification of unjust enrichment claims is proper. *E.g., Muzuco v. Re$ubmitIt, LLC,* 297 F.R.D. 504, 521 (S.D.Fla.2013).

### (iii) Unconscionability Claims

■ The Court finds that common issues also predominate as to the unconscionability claims. Because unconscionability is judged "at the time the contract was made,"[12] the Court holds that disclosures made after customers' accounts were opened are immaterial to the analysis. The account agreements are materially identical, and the trier of fact could conclude, based on subclass-wide proof, that Wachovia's affirmative misrepresentations and failures to disclose the operative features of its overdraft policies were sufficiently unfair and deceptive as to be unconscionable. *See Davis v. Cash For Payday, Inc.,* 193 F.R.D. 518, 522–23 (N.D.Ill.2000) (certifying unconscionability class claim because common issues predominate); *In re United Cos. Fin. Corp.,* 276 B.R. 368, 375–76 (D.Del.2002) (collecting cases).

■ Common issues also predominate for procedural unconscionability, which looks to such considerations as the disparity in bargaining power between the parties, *e.g., Kinkel v. Cingular Wireless LLC,* 223 Ill.2d 1, 306 Ill.Dec. 157, 857 N.E.2d 250, 264 (2006), whether the contract was presented on a take-it-or-leave-it basis, *id.,* 306 Ill.Dec. 157, 857 N.E.2d at 265, and whether important terms are hidden in a maze of fine print, *e.g., Glassford v. BrickKicker,* 191 Vt. 1, 35 A.3d 1044, ¶¶ 28–30 (2011); *see also* DE 514 at 5–6. Particularly because Wachovia's cus-

tomers were similarly situated vis-à-vis the Bank, any individualized issues having to do with differences in customers' backgrounds do not swamp the common issues arising from the features of Wachovia's account agreement and its formation. Whether or not the claims of unconscionability succeed, they will be decided by reference to common proof at trial.

In summary, Wachovia's corporate policies "constitute the very heart" of the claims for which Plaintiffs seek class certification; as a result, common issues will predominate because those policies "would necessarily have to be re-proven by every plaintiff." *Klay,* 382 F.3d at 1257; *see also Allapattah Servs., Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir.2003), *aff'd,* 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005).

In opposition, Wachovia relies on two Eleventh Circuit cases, *Klay* and *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,* 601 F.3d 1159 (11th Cir.2010). Nonetheless, the problems that plagued those cases are simply not present here. In *Klay,* the court ultimately found certification of the breach of contract claims inappropriate given the individualized issues of fact they entailed, even though questions of contract law were common to the whole class. *Id.* at 1261. There were many different defendants with many different contracts with many different provider groups. Moreover, because the defendants breached the contracts through a variety of means and differing computer algorithms that were not subject to generalized proof, each physician would have to prove a variety of individual circumstances leading to the breach. *Id.* at 1263–64.

Similar problems precluded certification in *Sacred Heart,* where there were substantial variations in the terms of over 300 hospital contracts that were individually negotiated, leading the court to find that "the diversity of the material terms is overwhelming." *Sacred Heart,* 601 F.3d at 1171–72. In contrast, the account agreements at issue here

---

**12.** *See Zapatha v. Dairy Mart, Inc.,* 381 Mass. 284, 408 N.E.2d 1370, 1375 (1980); E. Allan Farnsworth, Contracts, § 4.28 n. 53 (2d ed. 1990)

("UCC 2–302 does make it clear that any unfairness in the terms is to be judged at the time the contract is made and not at some later time").

are uniform form contracts offered on a take-it-or-leave it basis that were not the product of any individual negotiation. *Id.* at 1171 ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment."). Nor need Plaintiffs prove a variety of individual circumstances supporting the breach, as Wachovia's standard re-sequencing policy resulted in uniform conduct directed at all members of the Class.

Judge Alsup's certification in the California class action, *Gutierrez v. Wells Fargo Bank, N.A.,* is instructive. As here, Wachovia insisted that individual issues predominated. Judge Alsup, however, disagreed because the "challenged practice is a standardized one applied on a routine basis to all customers." 2008 WL 4279550, at *17, 2008 U.S. Dist. LEXIS 70124, at *48 (N.D.Cal. Sept. 11, 2008). Thus, while "there will be some individual issues ... these individual variations will not predominate over the pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds of thousands of depositors." *Id.* These circumstances make for a quintessential class action. Here, as in *Gutierrez,* Plaintiffs allege that Wachovia resequenced debit card transactions posted to their checking accounts from highest to lowest in order to maximize overdraft penalties against customers. Moreover, as in *Gutierrez,* Wachovia's "challenged practice is a standardized one applied on a routine basis to all customers." *Id.* at *17, 2008 U.S. Dist. LEXIS 70124 at *48. Any individual issues will "not predominate over the pervasive commonality of the highest-to-lowest posting method and its adverse impact on hundreds of thousands of depositors." *Id. Gutierrez* was successfully tried to a verdict, and the Court of Appeals affirmed Judge Alsup's prudent recognition of the propriety of class treatment. 704 F.3d 712, 729 (9th Cir.2012) ("[W]e are hard pressed to agree that any class member would prefer to incur multiple overdraft fees.").

## B. Superiority

██ A class action is the only realistic way Plaintiffs' claims can be adjudicated.

"Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v. Tallant,* 710 F.2d 711, 718 (11th Cir.1983). The class action fills an essential role when the plaintiffs would not have the incentive or resources to prosecute relatively small claims in individual suits, leaving the defendant free from legal accountability. The Supreme Court has long recognized that where, as here, "it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Deposit Guar. Nat'l Bank of Jackson, Miss. v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). "[T]he class action device is the only economically rational alternative when a large group of individuals or entities has suffered an alleged wrong, but the damages done to any single individual or entity are too small to justify bringing an individual action." *In re Am. Express Merchants' Litig.,* 634 F.3d 187, 194 (2d Cir. 2011); *see, e.g., Phillips Petro. Co. v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (noting that the class action mechanism may empower "plaintiffs to pool claims which would be uneconomical to litigate individually," such as when most of them "would have no realistic day in court if a class action were not available"); *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1154 (11th Cir.1983) ("[T]he class attorney, who is familiar with the facts and the progress of the litigation, will be able to present the claimant's case. If relegated to a new suit, the individual might be unable to obtain counsel to prosecute his action when the amount of individual damages is relatively small.... By obviating the need to bring a new lawsuit, the expense of litigating the new individual claim is reduced.") (quoting *Pettway v. Am. Cast Iron Pipe Co.,* 576 F.2d 1157, 1220 n. 80 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979)).

██ Class treatment is superior to other available methods for the fair and efficient adjudication of this controversy. Nearly all of the Class members in these actions have claims that are so small that it would cost

them much more to litigate individually than they could ever hope to recover in damages, and thus there is no reason to believe that the Class members have any particular interest in controlling their own litigation. Wachovia suggests some Class members may have preferred an alternative posting order, but the legal and expert costs alone needed to litigate the case and calculate the damages would far exceed any individual Class member's recovery, and Wachovia does not demonstrate anything to the contrary. Concentrating the litigation via class treatment is logical as well as desirable.

As discussed above, Class members are readily ascertainable through objective criteria: Wachovia's own records of individuals who were assessed overdraft fees. As he did in *Gutierrez*, Plaintiffs' expert will identify members of the Class by running queries in Wachovia's computer database. Such work will be merely ministerial in nature, and will not be plagued by unique Class member issues. So too, damages will be calculated using the same Wachovia records used to identify the Class members. These facts make these cases eminently manageable as a class action, and multiple individual lawsuits would be substantially less manageable in any event. *See Klay*, 382 F.3d at 1272. Accordingly, the Court finds that Plaintiffs

have easily met the superiority requirement of Rule 23(b)(3).

## C. Affirmative Defenses

■ Wachovia's affirmative defenses do not defeat class certification. Affirmative defenses must meet the pleading standards in *Iqbal* and *Twombly*. *See Castillo v. Roche Labs., Inc.*, 2010 WL 3027726, at *2, 2010 U.S. Dist. LEXIS 87681, at *5 (S.D.Fla. Aug. 2, 2010) (noting that "a majority of district courts in Florida have applied this heightened pleading standard to affirmative defenses"). A number of Wachovia's affirmative defenses are insufficiently pled because they are mere "labels and conclusions": compressed allegations formulaically reciting the elements of the affirmative defenses. *Id.* These defenses cannot withstand a motion to strike, much less preclude certification.

Even if Wachovia's affirmative defenses were sufficiently pled, they would do not defeat certification here because they raise common questions of proof that predominate over individualized issues. Many of the affirmative defenses require a party to have had *full knowledge* of the circumstances in order for the defense to prevail, including ratification,[13] waiver,[14] voluntary payment,[15] and

13. *See Exchange Sec. Bank v. King*, 53 Ala.App. 429, 301 So.2d 193, 196 (1974); *United Bank v. Mesa N.O. Nelson Co.*, 121 Ariz. 438, 590 P.2d 1384, 1386–87 (1979); *Dufresne v. Elite Ins. Co.*, 26 Cal.App.3d 916, 103 Cal.Rptr. 347, 354 (1972); *Adams v. Paine, Webber, Jackson & Curtis, Inc.*, 686 P.2d 797, 801 (Colo.App.1983); *Il Giardino, LLC v. Belle Haven Land Co.*, 254 Conn. 502, 757 A.2d 1103, 1120 (2000); *Dannley v. Murray*, 1980 WL 268061, *4 (Del.Ch. July 3, 1980); *Wittlin v. Giacalone*, 171 F.2d 147, 148 (D.C.Cir.1948) (applying D.C. law); *Deutsche Credit Corp. v. Peninger*, 603 So.2d 57, 58–59 (Fla.Dist.Ct.App.1992); *Stewart v. Storch*, 274 Ga.App. 242, 617 S.E.2d 218, 222 (2005); *Wing v. Lederer*, 77 Ill.App.2d 413, 222 N.E.2d 535, 538 (1966); *Prather v. Colo. Oil & Gas Corp.*, 218 Kan. 111, 542 P.2d 297, 303 (1975); *Oaks v. Connors*, 339 Md. 24, 660 A.2d 423, 426 (1995); *R.T. Polk Cotton Co. v. Bethel*, 136 Miss. 154, 96 So. 305, 305 (1923); *Cardinal v. C.H. Masland & Sons*, 87 Nev. 224, 484 P.2d 1075, 1079 (1971); *Martin Glennon, Inc. v. First Fidelity Bank, N.A.*, 279 N.J.Super. 48, 652 A.2d 199, 205 (1995); *Am. Motorists Ins. Co. v. Keep Servs., Inc.*, 63 A.D.3d 865, 881 N.Y.S.2d 477, 479 (2009); *Leiber v. Arboretum Joint Venture, LLC*, 208 N.C.App. 336, 702 S.E.2d 805, 812 (2010); *DeSilvio v.*

*Restauire*, 264 Pa.Super. 528, 400 A.2d 211, 213 (1979); *Anthony v. Padmar, Inc.*, 320 S.C. 436, 465 S.E.2d 745, 755 (1995); *Regions Bank v. Bric Constr., LLC*, 380 S.W.3d 740, 764 (Tenn.Ct. App.2011); *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 536 (Tex.2002); *Smith v. Mountjoy*, 280 Va. 46, 694 S.E.2d 598, 603 (2010).

14. *Hughes v. Mitchell Co.*, 49 So.3d 192, 201 (Ala.2010); *Occidental Life Ins. Co. v. Jacobson*, 15 Ariz. 242, 137 P. 869, 870 (1914); *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal.App.4th 666, 95 Cal.Rptr.2d 583, 592 (2000); *Adams*, 686 P.2d at 801; *Post v. Meijas*, 2009 WL 865287, at *3 (Conn.Super.Ct. Mar. 5, 2009); *In re Estate of Branson*, 2010 WL 3449235, at *10 n. 125 (Del. Ch. Sept. 1, 2010); *Cooper v. Goldsmith*, 135 F.2d 949 (D.C.Cir.1943) (applying D.C. law); *Fireman's Fund Ins. Co. v. Vogel*, 195 So.2d 20, 24 (Fla.Dist.Ct.App.1967); *State Mut. Ins. Co. v. Harmon*, 72 Ga.App. 117, 33 S.E.2d 105 (1945); *Hensel v. Capital Live Stock Ins. Co.*, 219 Ill.App. 77, 81–82 (1920); *Kan. Wheat Growers' Ass'n v. Windhorst*, 129 Kan. 528, 283 P. 638, 641 (1930); *Taylor v. Mandel*, 402 Md. 109, 935 A.2d 671, 687 (2007); *Titan Indem. Co. v. Hood*, 895 So.2d 138, 150 (Miss.2004); *Thompson v. City of N. Las*

laches.[16] *See TD Bank,* 281 F.R.D. at 678–79; *Union Bank,* 275 F.R.D. at 677–78 & n. 8. Plaintiffs allege, and offer evidence to prove, that Wachovia promulgated misinformation and concealed material aspects of its overdraft scheme from its customers, including its invariable use of high-to-low debit posting and its "shadow" line of credit practice. If Plaintiffs can prove these facts, they will undercut Wachovia's defenses through the use of common evidence. To the extent Wachovia could prove that some customers obtained full knowledge of Wachovia's scheme—which Plaintiffs deny occurred during the Class Period—yet continued to incur and pay overdraft fees, the presence of individualized defenses against a small number of Class members would not destroy the predominance of common liability questions.

*See Smilow v. S.W. Bell Mobile Sys., Inc.,* 323 F.3d 32, 39 (1st Cir.2003); *Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 45 (E.D.N.Y.2008).

■ Other affirmative defenses such as accord and satisfaction, ratification, and set-off pertain to damages, and can be accounted for in Plaintiffs' expert's calculations. *See Union Bank,* 275 F.R.D. at 677 (setoff defense does not destroy predominance); *Carbajal,* 219 F.R.D. at 441 n. 2; *Allen v. Holiday Universal,* 249 F.R.D. 166, 177, 191 (E.D.Pa.2008). The Eleventh Circuit has made clear that individual issues relating to damages do not defeat class certification. *See Allapattah Servs., Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir.2003), *aff'd,* 545

*Vegas,* 108 Nev. 435, 833 P.2d 1132, 1134 (1992); *Cnty. of Morris v. Fauver,* 153 N.J. 80, 707 A.2d 958, 970 (1998); *Bellefonte Re–Ins. Co. v. Volkswagenwerk AG,* 102 A.D.2d 753, 756, 476 N.Y.S.2d 890 (N.Y.App.Div.1984); *McNally v. Allstate Ins. Co.,* 142 N.C.App. 680, 544 S.E.2d 807, 810 (2001); *Schwartz v. Rockey,* 593 Pa. 536, 932 A.2d 885, 893 (2007); *Harrison v. Ballington,* 330 S.C. 298, 498 S.E.2d 680, 682 (1998); *Arnold v. Locomotive Engineers Mut. Life & Acc. Ins. Ass'n,* 30 Tenn.App. 166, 204 S.W.2d 191, 195 (1946); *Murphy v. Canion,* 797 S.W.2d 944, 951 (Tex.App.1990); *Commonwealth v. Nat'l Council on Compensation Ins.,* 238 Va. 513, 385 S.E.2d 568, 571 (1989).

**15.** *CIT Comm'n Fin. Corp. v. McFadden, Lyon & Rouse, LLC,* 37 So.3d 114, 127–28 (Ala.2009); *Moody v. Lloyd's of London,* 61 Ariz. 534, 152 P.2d 951, 953 (1944); *Standard Box Co. v. Mut. Biscuit Co.,* 10 Cal.App. 746, 103 P. 938, 943 (1909); *Skyland Metro. Dist. v. Mountain W. Enter., LLC,* 184 P.3d 106, 127 (Colo.App.2007); *Morris v. City of New Haven,* 78 Conn. 673, 63 A. 123, 124 (1906); *W. Natural Gas Co. v. Cities Serv. Gas Co.,* 201 A.2d 164, 169 (Del.1964); *Voulgaris v. Press,* 116 A.2d 691, 692 (D.C.1955); *City of Key W. v. Fla. Keys Cmty. Coll.,* 81 So.3d 494, 500 (Fla.Dist.Ct.App.2012); *Anthony v. Am. Gen. Fin. Servs., Inc.,* 287 Ga. 448, 697 S.E.2d 166, 175 (2010); *Randazzo v. Harris Bank Palatine, N.A.,* 262 F.3d 663, 667–71 (7th Cir.2001) (applying Illinois law); *Waechter v. Amoco Production Co.,* 217 Kan. 489, 537 P.2d 228, 251 (1975); *Halle Dev., Inc. v. Anne Arundel Cnty.,* 371 Md. 312, 808 A.2d 1280, 1286 n. 16 (2002); *Graham McNeil Co. v. Scarborough,* 135 Miss. 59, 99 So. 502, 503 (1924); *Randall v. Lyon Cnty.,* 20 Nev. 35, 14 P. 583, 584 (1887); *Messner v. Union Cnty.,* 34 N.J. 233, 167 A.2d 897, 898 (1961); *Dillon v. U–A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d 525, 760 N.Y.S.2d 726, 790 N.E.2d 1155, 1156 (2003); *Collins v. Covert,* 246

N.C. 303, 98 S.E.2d 26, 29 (1957); *Wayne M. ChiurazzMGC Therese [OV review]: i Law Inc. v. MRO Corp.,* 27 A.3d 1272, 1281 n. 4 (Pa.Super.Ct.2011); *Hardaway v. S. Ry. Co.,* 90 S.C. 475, 73 S.E. 1020, 1025 (1912); *Pratt v. Smart Corp.,* 968 S.W.2d 868, 871 (Tenn.Ct.App.1997); *Tyler v. Tyler,* 742 S.W.2d 740, 743 (Tex.App. 1987); *Williams v. Consolvo,* 237 Va. 608, 379 S.E.2d 333, 336 (1989).

**16.** *Caudle v. First Fed. Sav. & Loan Ass'n,* 295 Ala. 274, 327 So.2d 911, 912 (1976); *Summit Props. Inc. v. Wilson,* 26 Ariz.App. 550, 550 P.2d 104, 109 (1976); *Godfrey v. Godfrey,* 30 Cal. App.2d 370, 86 P.2d 357, 362 (1939); *In re Water Rights of Cent. Colo. Water Conservancy Dist.,* 147 P.3d 9, 17 (Colo.2006); *Martino v. Martino,* 28 Conn.Supp. 364, 262 A.2d 275, 276 (1970); *Wechsler v. Abramowitz,* 1984 WL 8244, at *1 (Del.Ch. Aug. 30, 1984); *Forrest v. Wardman,* 40 App.D.C. 520 (1913); *Chipola Valley Realty Co. v. Griffin,* 94 Fla. 1151, 115 So. 541, 542 (1927); *Hadden v. Thompson,* 202 Ga. 74, 42 S.E.2d 125, 127 (1947); *Hazard v. Hazard,* 205 Ill.App. 562, 568 (1917); *Hutchinson & S.R. Co. v. Fox,* 48 Kan. 70, 28 P. 1078, 1087–88 (1892); *Dickey v. Permanent Land Co.,* 63 Md. 170, 175 (1885); *Twin States Realty Co. v. Kilpatrick,* 199 Miss. 545, 26 So.2d 356, 358 (1946); *Gascue v. Saralegui Land & Livestock Co.,* 70 Nev. 83, 255 P.2d 335, 337 (1953); *Hill Dredging Corp. v. Risley,* 18 N.J. 501, 114 A.2d 697, 713 (1955); *Connell v. N.Y., O. & W. Ry. Co.,* 134 A.D. 231, 118 N.Y.S. 944 (N.Y.App.Div.1909); *Hughes v. Oliver,* 228 N.C. 680, 47 S.E.2d 6, 11 (1948); *Greencastle Livestock Mkt., Inc. v. Knauff,* 1955 WL 5287, at *15–16 (Pa.Com.Pl. May 25, 1955); *Newberry v. Newberry,* 257 S.C. 202, 184 S.E.2d 704, 706–07 (1971); *Uffelman v. Boillin,* 19 Tenn.App. 1, 82 S.W.2d 545, 569 (1935); *Fox v. Robbins,* 62 S.W. 815, 823 (Tex.App.1901); *Rice v. Scott,* 18 Va. Cir. 511, 1969 WL 101697 (Va.Cir.Ct.1969).

U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); *Sacred Heart*, 601 F.3d at 1178. Mitigation of damages, like the other damage-related affirmative defenses, is not a barrier to class certification. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y.2010); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 244 F.R.D. 79, 87 (D.Mass.2007); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 347 (E.D.Mich.2001). Further, neither extraordinary efforts nor an obligation to incur further expense or risk is required. *See, e.g., Murray v. N.Y. City Transit Auth.*, 20 Misc.3d 5, 862 N.Y.S.2d 706, 708 (N.Y.App.Term 2008); *Associated Metals & Minerals Corp. v. Dixon Chem. & Research, Inc.*, 82 N.J.Super. 281, 197 A.2d 569, 583 (1963).

■■■ Wachovia contends that class certification must be denied because there are individual issues regarding the application of various states' statutes of limitations as an affirmative defense. Courts consistently hold, however, that the statute of limitations does not bar class certification, even when individual issues are certain to exist.[17] As one court recently observed,

> Predominance is not defeated because the doctrines used by plaintiffs for 'tolling the statute of limitations,' such as the doctrine of fraudulent concealment, involve proof 'common to the defendants,' namely, 'the act of concealing' defendant's wrong. Indeed, '[c]ourts have been nearly unanimous ... in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action.'"

*Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D.Cal.2012) (citations omitted).

The dominant issue here, as it was in *Union Bank*, is whether Wachovia "engaged in a systematic scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly situated [Wachovia] consumers across the country." 275 F.R.D. at 670. Plaintiffs' claims and those of the Class can be determined by class-wide proof, and the Court finds Wachovia's affirmative defenses insufficient to defeat class certification.

## D. The Use of Subclasses

■■■ The Court also finds that the creation of subclasses to address variations in state law is appropriate here and makes these cases manageable and suitable for class treatment. *See, e.g., Klay*, 382 F.3d at 1262 (noting that "if applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."). The Court:

> may authorize aggregate treatment of multiple claims, or of a common issue therein, by way of a class action if the court determines that
>
> (1) a single body of law applies to all such claims or issues;
>
> (2) different claims or issues are subject to different bodies of law that are the same in functional content; or
>
> (3) different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court ... can manage by means of identified adjudicatory procedures.

American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010). Complete uniformity of state law is not required so long as there are no material conflicts among the laws. *See Southern States Police Benev. Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 90–91 (D.Mass.

---

**17.** *Piscioneri v. Commonwealth Land and Title Ins. Co.*, 2004 N.Y. Misc. LEXIS 256, at *1, *27 (N.Y.Sup.Ct. Jan. 8, 2004) (finding that affirmative defenses of estoppel, statute of limitations, and ratification did not prevent class certification because the central issue in the case was whether the class was harmed by defendant's actions);

*Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 353 n. 129 (S.D.N.Y.2010); *La Grasta v. First Union Sec., Inc.*, 2005 WL 1875469, *5–6, *9–10 2005 U.S. Dist. LEXIS 20207, at *19–20, *30 (M.D.Fla. 2005).

2007). The Court may certify multi-state classes even if "different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court ... can manage by means of" sub-classing. *Union Bank*, 275 F.R.D. at 679–80 (internal quotations omitted).

The proposed special verdict forms and supporting surveys of law submitted by Plaintiffs with their Trial Plan illustrate that the variations among the applicable state laws are not material and can be managed to permit a fair and efficient adjudication by the trier of fact. As detailed in Plaintiffs' Trial Plan, for their claims for breach of the covenant of good faith and fair dealing, Plaintiffs propose four subclasses. For unjust enrichment, Plaintiffs propose four subclasses. For unconscionability, three. In addition, there are two statutory subclasses covering California and New Jersey, respectively, only. Each subclass will have its own start date linked to the statute of limitations for each of those claims. For the reasons stated above, common issues predominate with respect to each of these claims. And, as set forth below, the subclasses proposed by Plaintiffs involve materially identical legal standards and will facilitate the manageability of these actions on a class basis.

### (i) Breach of the Contractual Covenant of Good Faith and Fair Dealing Claims

The glue that binds together these subclasses is the RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981), which each of the jurisdictions in question recognizes for the rule that the duty of good faith and fair dealing is implied in every contract. *See* Trial Plan at 13–15 & Exhibits cited therein. That some states may forbid a contractual covenant claim where the contract expressly permits the activity in question does not create material variations for the issues being certified. *See In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D.Ohio 1997). Nor is an inquiry into the subjective state of mind of each customer's expectations or preferences necessary. The differences among the four subclasses can be summarized as follows: the states in Subclass 1 treat the breach of the implied covenant of good faith and fair dealing as a separate cause of action; thus, a party may breach the implied covenant without breaching an express provision of the contract, while the states in Subclass 2 treat the implied covenant claims as part of the breach of contract claims. Subclass 3 requires an actual breach of the contract, while the states in Subclass 4 treat the implied covenant as part of the breach of contract claim and requires a plaintiff to show that the breach was material. The Court finds on these facts that the issues bearing on the justness of Wachovia's systemic conduct predominate within each proposed subclass and that this claim is clearly appropriate for class treatment. Accordingly, the Court reaffirms that Plaintiffs have adequately alleged a claim for breach of the contractual covenant of good faith and fair dealing, and certifies these subclasses.

### (ii) Unjust Enrichment Claims

The Court previously ruled that Plaintiffs may proceed in the alternative on claims for unjust enrichment and breach of the contractual covenant of good faith and fair dealing. DE 305 at 32–33. As the Court noted, Wachovia may attempt to force an election of remedies (at law or in equity) through motion practice at an appropriate juncture, but the coexistence of these unjust enrichment claims with contractual claims does not affect the manageability of the class action itself. At their core, each unjust enrichment subclass flows from the principles enshrined in the RESTATEMENT (FIRST) OF RESTITUTION § 1 & cmt. a (1937). *See* Trial Plan at 15–16 & Exhibits cited therein. While the Court has previously discussed its view that unjust enrichment requires the same essential showing in every jurisdiction—the defendant unjustly obtained a benefit at the plaintiff's expense such that restitution is warranted— Plaintiffs here propose certifying four distinct subclasses, which is certainly appropriate. Specifically, the states in Subclass 1 require a showing that (i) the plaintiff conferred a benefit; and (ii) the defendant accepted or retained that benefit; (iii) under circumstances that would make it unjust for the defendant to retain the benefit. The states in Subclass 2 require the plaintiff to

prove a single additional element: that the defendant appreciated the benefit conferred. The states in Subclass 3 follow the definition of unjust enrichment in Restatement (First) of Restitution § 1 and also require the plaintiff to prove that the plaintiff lacks an adequate remedy at law. The states in Subclass 4 follow the definition of unjust enrichment in Restatement (First) of Restitution § 1 and also require the plaintiff to prove that the defendant engaged in wrongful conduct. As alluded to above, many courts have certified multi-state unjust enrichment claims under circumstances similar to those here. *E.g., Terazosin Hydrochloride,* 220 F.R.D. at 697 n. 40; *Mercedes II,* 267 F.R.D. at 119. The Court follows these sound authorities.

### (iii) Unconscionability Claims

Plaintiffs' Trial Plan also proposes three workable subclasses for their unconscionability claims, all of which derive from Section 2–302 of the Uniform Commercial Code. The only differences among the states' laws pertain to whether both procedural and substantive unconscionability are required. *See* Trial Plan at 17–18 & Exhibits cited therein. Subclass 1 includes states the law of which requires both procedural and substantive unconscionability, and hence subsumes Subclass 3, which includes states which require either procedural or substantive unconscionability. The law in Subclass 2 states, meanwhile, requires only substantive unconscionability.

The Court has previously addressed whether unconscionability may be pled as an affirmative claim. *See* DE 305 at 26 (concluding that while unconscionability is normally a defense, that is not uniformly true and in the circumstances of these cases, it is appropriate to permit it as an affirmative claim). The Court remains convinced that this conclusion is correct, and that the Court's equitable powers permit a declaration that Wachovia's contractual clauses purporting to reserve discretion to re-sequence debit card transactions from highest to lowest so as to maximize overdraft charges are unconscionable under each of the relevant states' laws. Again, the Court finds that Wachovia's customers' individual preferences, knowledge, and levels of sophistication are not relevant to this inquiry.

(iv) The Court further certifies a statutory subclass under the New Jersey consumer protection statute, N.J. Stat. § 56:8–2, which prohibits trade practices determined to be unfair, deceptive, or unconscionable, as those terms are defined in N.J. Stat. § 56:8–1.

(v) The Court similarly certifies a statutory subclass under the California unfair trade practices act, Cal. Bus. & Prof.Code § 17200 *et seq.*

Lastly, Wachovia maintained at the class certification hearing that the Court should not certify subclasses represented by Plaintiffs from various underlying actions on the basis that the Court must remand each action to its originating jurisdiction at the close of pretrial proceedings. However, each and every subclass possesses a materially identical legal claim and is headed up by Bank customers who share that claim and have ample incentive to prosecute it. There are no "headless" subclasses, and customers in every state in which Wachovia did business, stand to recoup their allegedly excessive overdraft fees through at least one cause of action. The Court's plan appropriately protects the interests of all Class members to the extent feasible, given these named Plaintiffs and state laws, while also affording Wachovia the ability to defend itself in every instance. Rule 23 calls for nothing more.

The MDL mechanism, like Rule 23, aims to promote the just and efficient resolution of related civil actions. 28 U.S.C. § 1407. Congress created the MDL process to satisfy the need for judicial authority to manage matters of substantial controversy which, absent coordination, could "disrupt the functions of the Federal Courts." H.R.Rep. No. 1130, 90th Cong., 2d Sess. 1 (1968), reprinted in 1968 U.S.C.C.A.N. 1898, 1899 (Feb. 28, 1968). The MDL system is accordingly framed to ensure that related cases will receive "uniform and expeditious treatment," with the Court enjoying "broad discretion to structure a procedural framework for moving the cases as a whole as well as individually"—an MDL truly witnesses "a special breed of complex litigation where the whole is bigger than the sum of its parts." *In re PPA Prods. Liab. Litig.,* 460 F.3d 1217,

1230–32 (9th Cir.2006) (citation omitted); *accord Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 432 (5th Cir.2013) (affirming the MDL court's "flexible" case management strategies and "extensive supervision and control" to promote efficient resolution of a large controversy) (citations omitted). These principles strongly support the Court's coordinated, precise approach here.

Wachovia's argument overlooks not merely these core principles but also this Court's ability to exercise its discretion pragmatically and prudently to sequence trials and to remand discrete subclasses for trial. *See generally* Fed.R.Civ.P. 16(c) (authorizing the court to adopt special procedures, including ordering separate trials where appropriate on claims or issues). Other case management mechanisms—e.g., amended pleadings in the originating jurisdictions to add Plaintiffs from another coordinated case or otherwise—are available to ensure the just and efficient resolution of this controversy. Decisions on what will be tried where and when will be left for another day. The bottom line for purposes of Rule 23 is that these subclasses are reasonable and manageable because they group together materially identical claims to be pursued by qualified representatives who have demonstrated their firm commitment to seek relief both for themselves and for the similarly situated Wachovia customers.

For all the foregoing reasons, the Court certifies Plaintiffs' proposed subclasses, as defined in the table below.

## CONCLUSION

After careful consideration, and being fully advised as set forth above and in accordance with the findings herein, it is hereby

**ORDERED, DECREED, AND ADJUDGED** as follows:

1. Plaintiffs' Motion for Class Certification (**DE 3198**) be, and the same is, hereby **GRANTED.** The Court certifies the following Class:

All Wachovia customers in the United States who had one or more consumer accounts and who, from applicable statutes of limitation through August 13, 2010 (the "Class Period"), incurred an overdraft fee as a result of Wachovia's practice of sequencing debit card transactions from highest to lowest.

Excluded from the Class are Wachovia; its parents, subsidiaries, affiliates, officers and directors; any entity in which Wachovia has a controlling interest; all customers who make a timely election to be excluded; and all judges assigned to this litigation and their immediate family members.

2. The Court appoints Plaintiffs Anthony Poulin, Murlee Damor, Angela Gonzalez, Frances Pinckney, Charles Jones, Robert Thornton, and Celia Spears, formerly Celia Spears–Haymond as representatives of the Class, and as representatives of the following certified subclasses.

| Subclass | States Included | | Representative Plaintiffs |
|---|---|---|---|
| Good Faith and Fair Dealing Subclass # 1 | Arizona Connecticut Kansas New Jersey | California Delaware Nevada North Carolina | Celia Spears Murlee Damor Anthony Poulin |
| Good Faith and Fair Dealing Subclass # 2 | District of Columbia Mississippi Tennessee | South Carolina Virginia | Robert Thornton |
| Good Faith and Fair Dealing Subclass # 3 | Colorado Illinois New York | Georgia Maryland | Frances Knight Pinckney |
| Good Faith and Fair Dealing Subclass # 4 | Florida Pennsylvania | Alabama | Angela Gonzalez |
| Unjust Enrichment Subclass # 1 | California Mississippi | Connecticut District of Columbia | Celia Spears |

| | | | |
|---|---|---|---|
| Unjust Enrichment Subclass # 2 | Florida Kansas Pennsylvania Tennessee | Georgia Nevada South Carolina Virginia | Angela Gonzalez Frances Knight Pinckney Robert Thornton |
| Unjust Enrichment Subclass # 3 | Arizona Delaware New York | Colorado New Jersey North Carolina | Murlee Damor Anthony Poulin |
| Unjust Enrichment Subclass # 4 | Alabama | Texas | Charles Jones |
| Unconscionability Subclass # 1 | Alabama Colorado Delaware Florida Maryland New Jersey Pennsylvania Tennessee | California Connecticut District of Columbia Georgia Nevada North Carolina South Carolina Texas | Celia Spears Angela Gonzalez Frances Knight Pinckney Murlee Damor Anthony Poulin Charles Jones |
| Unconscionability Subclass # 2 | New York | Virginia | Robert Thornton |
| Unconscionability Subclass # 3 | Arizona Kansas | Illinois Mississippi | Celia Spears Angela Gonzalez Frances Knight Pinckney Murlee Damor Anthony Poulin Charles Jones |
| New Jersey Statutory Subclass | New Jersey | | Murlee Damor Anthony Poulin |
| California Statutory Subclass | California | | Celia Spears |

3. The Court also appoints the following firms as Class counsel pursuant to Fed.R.Civ.P. 23(g): Podhurst Orseck, P.A.; Bruce S. Rogow, P.A.; Grossman Roth, P.A.; Lieff Cabraser Heimann & Bernstein LLP; Webb, Klase & Lemond, LLC; Trief & Olk; Baron & Budd, P.C.; Golomb & Honik, P.C.; and Hagens Berman Sobol Shapiro LLP.[18]